769 A.2d 1116

COMMONWEALTH of Pennsylvania, Appellee,

v.

Jonathan FISHER, Appellant.

Supreme Court of Pennsylvania.

Argued Dec. 6, 2000.

Decided April 18, 2001.

506

508

510

Jeanette Dickerson, Hatboro, for Jonathan Fisher.

Robert A. Graci, Harrisburg, Mary McNeil Killinger, Patricia Eileen Coonahan, Norristown, for Com.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN, and SAYLOR, JJ.

## OPINION

SAYLOR, Justice.

Appellant, Jonathan Lamar Fisher, was convicted of murder in the first degree and other offenses for an incident that resulted in the death of Quentin Neal and injury to Matthew Burse. At the penalty phase of the trial, the jury returned a sentence of death. We affirm.

In the early morning hours of July 18, 1998, Rico Gonzalez was drinking a beer in his apartment in Norristown, Montgomery County, when he heard someone knocking on the main door to the apartment building. He left his apartment, opened the main door to the rooming house, and was knocked to the ground as Appellant rushed past him with a .22 caliber

rifle. Appellant ran to the top of the main staircase, where he encountered Annalisa Wodarski and asked her for the location of persons whom he did not name. When she failed to answer, Appellant approached a door at the end of the hall-way, opened it quietly, and peered inside. Wodarski then witnessed Appellant cock his rifle and enter the room, before she ran down the stairs and out of the building.

Appellant entered the room of Quentin Neal and Matthew Burse, which the two used as their principal place of business for their drug-dealing operations. Upon finding Neal asleep in a reclining chair, Appellant fired three shots at close range into Neal's chest. The gunshots awakened Burse, who was lying in a bed just a few feet away from Neal. Burse saw Appellant standing in front of Neal with the rifle pointed at Neal's chest. Appellant then turned to Burse, asking him for money. When Burse said that he did not have any money to give him, Appellant shot Burse in the shoulder and repeated the demand. Burse then produced sixty dollars; Appellant took the cash and fled the room. Burse raced after Appellant, attacked him, and wrestled the gun away from him, but Appellant was able to flee the scene.

A woman, who identified herself only as Colleen, telephoned the local emergency response number to report the shooting at 4:17 a.m. She described the gunman as a light-skinned African American male with freckles, who was approximately six feet tall, a description consistent with Appellant's appear-ance. The paramedics arrived shortly thereafter and trans-ported Neal to the hospital by helicopter. He was pronounced dead at 5:20 a.m. A subsequent autopsy revealed that Neal died when one of the bullets pierced his heart. At the scene, Burse, who appeared to police officers to be somewhat con-fused and shaken, stated that a man, whom he described as a six-foot-tall, light-skinned African–American male with freck-les, had first shot him and then murdered Neal. Burse was taken to the hospital and treated for a gunshot wound to his shoulder. After he received treatment, Burse was again questioned by an officer, at which time he explained that

Appellant had fired upon Neal before he, Burse, had been injured.

Meanwhile, Appellant had fled to the home of his stepmother, arriving there shortly before 5:00 a.m. He informed her and his stepbrother that he had just shot someone using the stepbrother's gun, that the police were looking for him, and that he had to get away. Appellant next called his girlfriend, Nyquallah Bey, telling her he was coming by her residence to retrieve some clothing. He then telephoned Genoa Tillman, the mother of one of his children, to ask for a ride. Tillman drove Appellant from his stepmother's house to his girlfriend's residence, where he retrieved his clothing, and then to Tillman's home, where she allowed him to remain for a few days. Fearing apprehension, Appellant eventually fled to New Jersey.

On May 11, 1999, nearly ten months after the shooting, federal agents arrested Appellant at 3:20 p.m. on a fugitive warrant in Newark, New Jersey, where he was living under the assumed name of Rellie Chambers. During transport to the holding facility, without prompting from law enforcement officials, Appellant made several statements, including, "I'm glad it's over," "I was tired of looking over my shoulder," "I want to talk to someone about this," and "How did you find me?" Appellant also asked if he could return to Pennsylvania to "get this over with." The officers responded only by stating that Appellant would have to wait to speak with the detective in charge at the police station.

At the station, the police advised Appellant of his constitutional rights.[1] Appellant signed a card provided by the police that detailed the *Miranda* warnings, indicating that he understood his rights and wished to remain silent. Appellant signed the card with the name Rellie Chambers and stated that he would not talk to the police until he had spoken with his current girlfriend. The officers complied with Appellant's request to telephone this woman, and when Appellant was unable to reach her using the police station telephone, an

1. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

officer offered Appellant the use of his cellular telephone. Appellant then unsuccessfully attempted to reach his girlfriend at home and at work and left a message instructing her to call him.

After these calls, Appellant admitted to using an assumed name and stated his desire to talk with a detective, asking that the card he had previously signed, which indicated that he did not wish to speak with the police, be destroyed. A detective informed Appellant that the first card could not be destroyed, but that Appellant could execute a second card if he now wanted to waive his rights. Appellant agreed and was again given the *Miranda* warnings; he then executed a written waiver of his rights, which he signed using the name Jonathan Fisher.

A detective began questioning Appellant at 5:25 p.m. During the course of the interrogation, the detective asked Appellant a series of questions regarding whether he had informed his stepmother and stepbrother that he had killed the victim. In response, Appellant laid his head on the table and said, "I'm a mother f———g murderer and they said I did it." When Appellant signed his statement at 7:29 p.m., the interrogation concluded.

Although the Newark police attempted to find a court to conduct Appellant's extradition hearing on the evening of May 11, 1999, they were unable to do so because the courts closed for the day within an hour of Appellant's arrest. They successfully located a judge the next morning, and Appellant, before the New Jersey Superior Court, waived an extradition hearing on the afternoon of May 12, 1999. A detective with the Montgomery County Police Department arranged to assume custody of Appellant the following morning, May 13, and return him to Pennsylvania. The officer retrieved Appellant from New Jersey at approximately 9:00 a.m. the next morning, and Appellant was arraigned that afternoon in Montgomery County.

Prior to Appellant's preliminary hearing, Wodarski, an eyewitness, and Burse, the surviving victim, were shown a photo-

graphic array of suspects matching their descriptions of the assailant. Both identified Appellant as the man responsible for the shooting. In preparation for a traditional line-up, Appellant was led through the prison where he was being detained and was asked to select several men whom he thought resembled himself to be included in the line-up. Appellant's trial counsel then reviewed Appellant's choices, approved three of them, and made two substitutions. During this line-up, both Wodarski and Burse again identified Appellant as the shooter without hesitation. Following both of these identifications and immediately prior to Appellant's preliminary hearing, Burse briefly witnessed Appellant in handcuffs being escorted by the police.

Appellant filed an omnibus pre-trial motion, seeking the suppression of the statements he made to the police while being transported to a holding facility following his arrest in New Jersey, his statement to the detective during his interrogation, and the identifications made by Burse and Wodarski. The trial court denied the motion.

At trial, Rico Gonzalez and Wodarski identified Appellant as the assailant. When cross-examined, both admitted that they had used illegal drugs in the days or hours preceding the murder, but denied that it affected their ability to accurately recall the event. Burse testified that it was Appellant who had shot him, and that he had ample opportunity to view his attacker when the two had struggled for the gun. Upon vigorous cross-examination, Burse also denied that his drug use affected his recollection and attributed the inconsistencies in his statements to police to the shock he was experiencing after witnessing the murder.

Appellant's stepmother and stepbrother next testified that Appellant had admitted his involvement in the crime to them. Furthermore, Nyquallah Bey and Genoa Tillman provided evidence of their part in Appellant's flight from the police. Appellant then sought to prevent Bey from testifying that, during a telephone conversation several months after the shooting, Appellant had told her that he had shot Neal because Neal had "burnt" him in a drug deal, claiming that this

impermissibly introduced evidence of his prior bad acts. The trial court denied the motion, allowing Bey to testify as to the conversation. A forensic pathologist testified that Neal had died as a result of a gunshot wound to the chest. Finally, the police officers testified as to the statements Appellant made during his transport to the police station and his interrogation.

Appellant was convicted of the first-degree murder of Neal, the robbery of Burse, burglary, aggravated assault upon Burse, and possession of an instrument of crime. He was acquitted on the charges of the attempted murder of Burse and the robbery of Neal. During the penalty phase, the Commonwealth presented evidence of three aggravating factors: 1) Appellant committed the murder while in the perpetration of a felony; 2) Appellant knowingly created a grave risk of death to another person in addition to the victim of the offense; and 3) at the time of the killing, the victim was or had been involved, associated, or in competition with Appellant in the sale, manufacture, distribution, or delivery of any controlled substance in violation of the Controlled Substance, Drug, Device and Cosmetic Act. *See* 42 Pa.C.S. § 9711(d). In mitigation, Appellant relied upon: 1) his age at the time of the crime (24); and 2) the catch-all factor. *See* 42 Pa.C.S. § 9711(e). The jury determined that Appellant's age and his relationship with his family members and future responsibility to them were mitigating factors, but also found as aggravating circumstances that the murder occurred during the commission of a felony and that Appellant's actions created a grave risk of death to another person. Concluding that the aggravating circumstances outweighed the mitigating circumstances, the jury imposed a sentence of death.

## SUFFICIENCY OF THE EVIDENCE

■ Appellant challenges his convictions for burglary and first-degree murder, arguing that the evidence was insufficient to sustain the verdicts. When reviewing a challenge to the sufficiency of the evidence, an appellate court must view the evidence in the light most favorable to the Commonwealth as verdict winner and, drawing all reasonable inferences therefrom, determine whether the evidence was sufficient to enable

the jury to conclude that all the elements of the offense were established beyond a reasonable doubt. *See Commonwealth v. Simmons,* 541 Pa. 211, 223, 662 A.2d 621, 627 (1995); *Commonwealth v. Hagan,* 539 Pa. 609, 613, 654 A.2d 541, 543 (1995).

In challenging his conviction for first-degree murder, Appellant contends that Burse, the main witness for the Commonwealth, was not credible, as he provided different accounts of the incident. Appellant further argues that, because several other Commonwealth witnesses admitted to drug use, either immediately before the events or in the preceding days, their testimony was also not credible. According to Appellant, the only evidence that the Commonwealth produced to show premeditation was a conversation between Appellant and his former girlfriend, during which Appellant stated that Neal had died because he had "burnt" him.

To prove first-degree murder, the Commonwealth must show that the accused acted with the specific intent to kill; that a human being was unlawfully killed; that the person accused did the killing; and that the killing was willful, deliberate, and premeditated. *See Commonwealth v. Spotz,* 552 Pa. 499, 506–07, 716 A.2d 580, 583 (1998), *cert. denied,* 526 U.S. 1070, 119 S.Ct. 1466, 143 L.Ed.2d 551 (1999); *Simmons,* 541 Pa. at 227–28, 662 A.2d at 629. The specific intent to kill can be inferred from the use of a deadly weapon on a vital part of the body. *See Spotz,* 552 Pa. at 506–07, 716 A.2d at 583; *Commonwealth v. Jones,* 542 Pa. 464, 484, 668 A.2d 491, 500 (1995).

In the present case, the record clearly establishes that Neal was unlawfully killed by a gunshot wound to the chest. The jury could reasonably infer that the murderer acted with specific intent from the fact that he used a deadly weapon, three shots from a rifle at close range, on a vital part of Neal's body. The evidence is also sufficient to prove beyond a reasonable doubt that it was Appellant who committed the killing. Several witnesses identified Appellant as the perpetrator, including Burse, Gonzalez, and Wodarski. While it is

true that Burse recounted a slightly different version of events to an officer at the crime scene just minutes after the shooting than the report he provided to police at the hospital, Burse testified that the discrepancies in his story were the result of his shock and confusion after witnessing the murder and being shot himself. However, even in his initial statement, Burse stated that Appellant was responsible for shooting both him and Neal. Additionally, although several Commonwealth witnesses admitted to using alcohol or illegal drugs in the days or hours prior to the homicide, each emphatically stated that this did not prevent him or her from recalling the events of the evening in question. The jury was free to assess the credibility of each of these witnesses, and obviously chose to believe their testimony, despite Appellant's attempts to undermine the import of this evidence by reference to the witnesses' drug use. *See Simmons*, 541 Pa. at 229, 662 A.2d at 630 (holding that the question of a witness's credibility is reserved exclusively for the jury and that the appellate court cannot substitute its judgment for that of the finder of fact); *Commonwealth v. Davis*, 518 Pa. 77, 82, 541 A.2d 315, 317 (1988) (same).

Furthermore, none of the concerns expressed by Appellant sheds serious doubt on the conclusion that Appellant was responsible for Neal's death, particularly in light of his subsequent confessions to various friends and family members, and eventually the police. Finally, we note that, faced with the overwhelming evidence placing him at the crime scene, Appellant chose to admit in his closing argument that he had killed Neal, but to argue that the homicide amounted to only third-degree murder. Viewing this evidence in the light most favorable to the Commonwealth, we conclude that it was sufficient for the jury to find beyond a reasonable doubt that Appellant was responsible for the killing.

 Appellant's argument that the Commonwealth failed to present evidence indicating that he acted with premeditation is also without merit. The period of reflection necessary to constitute premeditation may be very brief; in fact, the design to kill can be formulated in a fraction of a second. *See*

*Commonwealth v. Mason,* 559 Pa. 500, 510, 741 A.2d 708, 713 (1999), *cert. denied,* —— U.S. ——, 121 S.Ct. 81, 148 L.Ed.2d 43 (2000). Premeditation and deliberation exist whenever the assailant possesses the conscious purpose to bring about death. *See id.* Appellant's argument that the only evidence the Commonwealth produced to establish this element was testimony indicating that Appellant acted in response to being "burnt" in a drug deal is unavailing. In fact, the Commonwealth presented evidence that Appellant entered Neal's apartment in the early hours of the morning and shot him three times in the chest at close range with a rifle while he slept. Unquestionably, these circumstances are consistent with the conclusion that Appellant acted with the conscious purpose to bring about Neal's death. The record, therefore, supports Appellant's conviction for first-degree murder.

Appellant also contends that the evidence was insufficient to support his conviction for burglary. He reasons that the Commonwealth failed to prove that his entry into Neal's apartment was unauthorized because the evidence established that the room was located in a crack house, open to any person wishing to smoke crack cocaine.

A person is guilty of burglary if he enters a building or occupied structure, or a separately secured or occupied portion thereof, with intent to commit a crime, unless the premises are at the time open to the public or the actor is licensed or privileged to enter. *See* 18 Pa.C.S. § 3502(a). The record simply does not support Appellant's claim that the public, or Appellant himself, was privileged to enter the apartment where Neal resided. Rather, testimony established that the rooming house was private property, that Neal leased a room from the owner, and that Neal and Burse carefully controlled entry into the apartment. Before any party was allowed to enter to purchase cocaine, he was required to knock and receive permission to enter or be escorted by one of Neal's associates in the drug business. The structure, thus, was not open to the public at large. Furthermore, both Neal and Burse were asleep at the time of Appellant's entry and were unable to grant access to the room, negating any claim that

Appellant was authorized to enter the premises. Since the evidence clearly established that Appellant entered a separately secured portion of a building for the purpose of committing a crime (in this case, either the murder, the robbery, or the aggravated assault), his conviction for burglary is sustained.

**GUILT PHASE**

**Pre–Trial**

Appellant presents several claims of pre-trial error. First, he argues that the court improperly failed to suppress the statements he made during his transport to the police station in New Jersey, arguing that they are inadmissible because he had not yet been issued *Miranda* warnings. Appellant contends that his statements were the result of a custodial interrogation, and that he should have been advised of his constitutional rights after his initial remark, "I'm glad it's over." According to Appellant, the officers' silence after this remark and their later statement, that he would have to wait to speak with the assigned detective at the station house, constituted conduct designed to elicit incriminating information. Since Appellant made the challenged statements as a result of inappropriate police interrogation tactics, he argues, they must be suppressed.

When reviewing the denial of a suppression motion, we consider whether the factual findings of the suppression court and the legal conclusions drawn therefrom are supported by the evidence. *See Commonwealth v. Koehler,* 558 Pa. 334, 352, 737 A.2d 225, 234 (1999), *cert. denied,* 531 U.S. 829, 121 S.Ct. 79, 148 L.Ed.2d 41 (2000). *Miranda* warnings are necessary only when the suspect is subjected to custodial interrogation. *See Commonwealth v. Gwynn,* 555 Pa. 86, 100, 723 A.2d 143, 149, *cert. denied,* 528 U.S. 969, 120 S.Ct. 410, 145 L.Ed.2d 320 (1999). Interrogation occurs when the police should know that their words or actions are reasonably likely to elicit an incriminating response, *see id.,* and the circumstances must reflect a measure of compulsion above and beyond that inherent in custody itself. *See Commonwealth v. Bracey,* 501 Pa. 356, 366, 461 A.2d 775, 780 (1983). In this

case, it is undisputed that Appellant was in custody at the time he made the statements, as he had just been arrested. Although he argues that the transporting officers' conduct constituted an interrogation, Appellant does not dispute that the officers neither questioned him nor initiated a conversation. The trial court, acting in the suppression context, determined that the officers had engaged in no conduct designed specifically to elicit incriminating information from Appellant, but rather, told him that he should wait to speak to the investigating detective before making any statements. Considering that Appellant's version of the exchange is consistent with the officers' testimony, we conclude that the evidence supports the findings of the trial court.

■ Appellant's remarks, being unsolicited, not the result of custodial interrogation, constituted spontaneous, voluntary statements not subject to suppression. *See Commonwealth v. Gibson,* 553 Pa. 648, 662, 720 A.2d 473, 480 (1998) (holding that voluntary statements that are not responsive to any queries are admissible), *cert. denied,* 528 U.S. 852, 120 S.Ct. 132, 145 L.Ed.2d 111 (1999); *Commonwealth v. King,* 554 Pa. 331, 355, 721 A.2d 763, 775 (1998) (finding that a defendant's unsolicited remarks are admissible), *cert. denied,* 528 U.S. 1119, 120 S.Ct. 942, 145 L.Ed.2d 819 (2000); *Commonwealth v. Baez,* 554 Pa. 66, 84, 720 A.2d 711, 720 (concluding that spontaneous statements, not the product of police conduct, are admissible even when the suspect has not received *Miranda* warnings), *cert. denied,* 528 U.S. 827, 120 S.Ct. 78, 145 L.Ed.2d 66 (1998). The record indicates that Appellant volunteered these statements of his own free will; thus, the remarks constitute merely gratuitous utterances unsolicited by the government and are admissible.

Appellant next contends that his statement to the police in New Jersey should have been suppressed because it was coerced by an unnecessary delay between his arrest in New Jersey and his arraignment in Montgomery County. Appellant argues, despite the fact that his statement was obtained in the first few hours after his arrest, that the forty-eight-hour

delay between his arrest and arraignment had a coercive effect.

Appellant is not entitled to relief on this claim. Statements made in the first six hours after arrest, but prior to arraignment, are admissible, unless the statements were made under "such a coercive effect as to violate the rights of the accused." *Commonwealth v. Duncan*, 514 Pa. 395, 406, 525 A.2d 1177, 1182 (1987); *see also Commonwealth v. Persiano*, 555 Pa. 428, 432, 725 A.2d 151, 154 (1999) (noting that, if the defendant's statement was obtained within six hours, he was not threatened or coerced, physically or psychologically, and he was mentally alert, the court may conclude his statement was voluntary). In this case, the trial court found that Appellant reinitiated the conversation with police, was issued *Miranda* warnings a second time, freely signed a waiver, and made the challenged statement in the first few hours after arrest. The court further determined that the delay he experienced was neither coercive nor designed as an intimidation tactic, but instead occurred because there were no judges available on the evening of his arrest, and that the police located an available judge and arranged for the extradition hearing as quickly as possible. The evidence, including Appellant's express waiver of his rights and the lack of testimony indicating police misconduct, supports the trial court's conclusion that Appellant's statements were voluntary and admissible.

We note that this Court has previously rejected the argument that a statement following arrest outside the Commonwealth is inadmissible because of a delay in bringing the defendant into Pennsylvania for arraignment. In cases in which the defendant is arrested a significant distance outside the jurisdiction in which the crime was committed, strict adherence to the six-hour time frame for arraignment is not required. *See Commonwealth v. Marrero*, 546 Pa. 596, 605, 687 A.2d 1102, 1106 (1997) (quoting *Commonwealth v. D'Amato*, 514 Pa. 471, 486, 526 A.2d 300, 307 (1987)). In *Marrero*, the defendant was arrested on a fugitive warrant in Cleveland, Ohio at 9:20 p.m., and was interrogated by police from 3:30

a.m. to 5:30 a.m. the following morning; he was not arraigned in Pennsylvania until a week after his initial arrest. We upheld the admissibility of the defendant's statement, finding that, whatever validity the *Duncan* rule retains in such situations, its "six-hour clock" does not begin to run until the defendant is returned to the judicial district wherein the arrest warrant was issued... *See id.* As there was no evidence that police used coercive tactics in questioning Marrero, and he was promptly arraigned upon his return to Pennsylvania, his statement was properly admitted. Similarly here, Appellant alleges no coercive conduct beyond the delay and he was promptly arraigned upon his return to Montgomery County. Thus, Appellant's claim that he was prejudiced by the delay between arrest and arraignment must fail.

Appellant finds error in the trial court's decision to deny his motion to suppress the identifications made by Burse and Wodarski through the photo array and the traditional line-up. Appellant claims that the photographic identification process was unduly suggestive because both witnesses described the suspect as a light-skinned African–American male with freckles and a goatee, while only six of the eight pictures in the line-up showed men with goatees, and only one, the picture of Appellant, showed a man with freckles. He further argues that the in-person line-up was likewise flawed, because the other participants did not closely resemble Appellant in height and weight.

A photographic identification is unduly suggestive when the procedure creates a substantial likelihood of misidentification. *See Commonwealth v. Johnson (William)*, 542 Pa. 384, 396–97, 668 A.2d 97, 103 (1995). Photographs used in line-ups are not unduly suggestive if the suspect's picture does not stand out more than those of the others, and the people depicted all exhibit similar facial characteristics. *See id.* The trial court reviewed the array, the pictures for which were selected by a computerized system based upon similarity to Appellant, and found nothing unduly suggestive. The court noted that the men depicted had similar complexions, facial features, and facial hair to Appellant. Upon review of the

record, including the photo array at issue, we find no abuse of discretion in the trial court's assessment of the array and its corresponding decision to admit the evidence.

Likewise, Appellant's contention that the traditional police line-up was improper must fail. When considering Appellant's motion, the trial court again reviewed the composition of the line-up and found that it was not unduly suggestive, noting that the other members of the line-up were within three years of Appellant's age and five inches of his height, and bore a substantial physical resemblance to him.[2] Upon review, we find no reason to disturb the holding of the trial court in this regard.

## Trial

Appellant next challenges Burse's in-court identification of him, asserting that Burse had seen him in shackles prior to the preliminary hearing. Conceding that in-court identifications may be admissible, despite impermissibly suggestive pretrial procedures, if there exists an independent basis for identification, *see Commonwealth v. Abdul–Salaam*, 544 Pa. 514, 529, 678 A.2d 342, 349 (1996), Appellant contends that Burse had no such independent basis for identifying him. Reasoning that, because Burse saw the attacker only after being awakened from a deep sleep and after being wounded, Appellant maintains that Burse's recollection may be unclear, precluding the Commonwealth from demonstrating that Burse had an adequate opportunity to view the assailant so as to be able to identify the murderer.

An in-court identification of a defendant need not be suppressed, despite a suggestive out-of-court identification, if the Commonwealth is able to establish by clear and convincing evidence that the later identification was not the result of the earlier suggestive event. *See id.; Commonwealth v. Carter*, 537 Pa. 233, 253, 643 A.2d 61, 71 (1994). To meet its

---

**2.** Appellant was 24 and the men in the line-up were 22 to 27 years old. Appellant weighs 187 pounds and is 6'0" tall. The other line-up participants weighed from 150 to 240 pounds and were between 5'7" and 6'2" in height.

burden in this regard, the prosecution must demonstrate that, under the totality of the circumstances, an independent basis existed for the identification. *See Abdul–Salaam,* 544 Pa. at 529, 678 A.2d at 349. The factors to be considered in determining whether an independent basis exists are:

> (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.

*Carter,* 537 Pa. at 253–54, 643 A.2d at 71. This court's review of these factors is limited to a determination of whether the Commonwealth has produced sufficient evidence to establish the independent basis. *See Abdul–Salaam,* 544 Pa. at 529–30, 678 A.2d at 349.

■ Contrary to Appellant's reasoning, Burse had ample time to view Appellant during the commission of the crime while Appellant was pointing the rifle at him and demanding money. Furthermore, Burse then chased Appellant as he fled the scene and wrestled the gun from him. This significant amount of contact with the perpetrator of the crime is sufficient to establish an independent basis for Burse's identification. Burse also accurately and consistently described Appellant to police officers as the man responsible for his injury and specifically denied having any doubts as to Appellant's identity. Moreover, prior to the preliminary hearing when the allegedly suggestive procedure occurred, Burse twice identified Appellant in line-ups conducted by the police. Therefore, there existed sufficient evidence to establish that Burse had an independent basis, free from taint, by which to identify Appellant.

■ Appellant also alleges error in the admission of the testimony of his former girlfriend, Nyquallah Bey, to the effect that he admitted to attacking Neal because Neal had "ripped him off" or "burnt" him in prior drug transactions. Appellant challenges the trial court's decision to allow this

testimony, arguing that it impermissibly introduced evidence of his prior bad acts, and that, even if the evidence was admissible to demonstrate motive, its probative value was outweighed by its prejudicial effect, warranting its exclusion.

[21] While evidence of prior bad acts is inadmissible to show that a defendant acted in conformity with those past acts or to show a criminal propensity, see Pa.R.E. 404(b)(1), such evidence may be admitted to prove, *inter alia*, motive, intent, or identity. *See* Pa.R.E. 404(b)(2). Where the evidence is relevant, the mere fact that testimony of another crime may be prejudicial does not *per se* preclude its introduction into evidence. *See Commonwealth v. Hall*, 523 Pa. 75, 85, 565 A.2d 144, 148 (1989) (finding no abuse of discretion in allowing the Commonwealth to question the defendant regarding his drug-dealing activities, as the evidence was relevant to the defendant's motive). Such evidence may be significant and admissible to establish that: the victims were known drug dealers; the victims recently cheated the appellant in a drug deal; and the appellant had killed the victims in revenge for cheating him. *See id.* at 85, 565 A.2d at 149.

At Appellant's trial, the witness's testimony was offered to establish Appellant's motive for the killing and was, therefore, proper. Furthermore, the evidence was not unduly prejudicial merely because it was damaging to Appellant's case, as Appellant objects to one statement regarding his drug-related motive, and the trial court instructed the jury as to the proper consideration to be given the prior bad act evidence so that it would not be impermissibly regarded as evidence of Appellant's general bad character. *See Commonwealth v. LaCava*, 542 Pa. 160, 176, 666 A.2d 221, 228 (1995) (holding that the admission of prior bad acts evidence is not reversible error when offered for a proper purpose and accompanied by a cautionary instruction). Under these circumstances, we find no abuse of discretion in allowing this testimony.

**PENALTY PHASE**

Following a verdict of guilty of murder in the first-degree, a trial court is required to conduct a sentencing hearing to

determine whether a sentence of death or life imprisonment should be imposed. *See* 42 Pa.C.S. § 9711(a)(1). The verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance and no mitigating circumstances, or if the jury unanimously finds one or more aggravating circumstances that outweigh any mitigating circumstances. The verdict must be a sentence of life imprisonment in all other cases. *See* 42 Pa.C.S. § 9711(c)(1)(iv).

The Commonwealth has the burden of proving each of the aggravating factors it presents beyond a reasonable doubt. *See* 42 Pa.C.S. § 9711(c)(1)(iii). In this case, upon presentation by the Commonwealth of three aggravating factors, the jury concluded that the murder was committed during the perpetration of a felony, *see* 42 Pa.C.S. § 9711(d)(6), and presented a grave risk of death to a second victim, *see* 42 Pa.C.S. § 9711(d)(7), but determined that the Commonwealth had not met its burden with regard to its final claim, that a drug association had given rise to the murder. *See* 42 Pa.C.S. § 9711(d)(14). The jury also found the existence of two mitigating factors, but concluded that the aggravating circumstances outweighed the mitigating circumstances and sentenced Appellant to death. Appellant contends that the Commonwealth failed to establish any of the three aggravating circumstances, and that the trial court erred in submitting them to the jury.

■■■ Appellant argues that the Commonwealth failed to establish beyond a reasonable doubt that the murder occurred during the commission of a felony, claiming that, because the jury acquitted Appellant of the robbery of Neal, that could not be the felony during which the murder occurred. He further contends that, because the robbery of Burse occurred after the murder of Neal, that also could not have been the associated felony. We agree that the jury could not find that the murder occurred during the felonious robbery of Neal because it acquitted him of that charge; however, the record reveals sufficient evidence by which the jury could conclude that the murder occurred during the felonious robbery of Burse. Testimony of several witnesses supports the conclusion that Ap-

pellant entered the premises with the intention of recovering by force money that he believed Neal and Burse owed to him. While the physical robbery did occur after Neal's death, the jury may consider that the murder took place during the commission of the robbery so long as the killing occurred so close in time and space to the robbery that it could reasonably be considered part of that felony. *See Commonwealth v. Edmiston*, 535 Pa. 210, 235, 634 A.2d 1078, 1091 (1993). Additionally, at the time of the murder, Appellant was clearly engaged in the commission of a burglary, a crime that alone establishes the aggravating circumstance. Viewing this evidence in the light most favorable to the verdict winner, *see Commonwealth v. Johnson (Roderick)*, 556 Pa. 216, 243, 727 A.2d 1089, 1102 (1999), *cert. denied*, 528 U.S. 1163, 120 S.Ct. 1180, 145 L.Ed.2d 1087 (2000), we conclude that the Commonwealth produced sufficient evidence by which the jury could determine beyond a reasonable doubt that Appellant committed the murder during the perpetration of a felony.

Appellant next argues that the Commonwealth failed to prove that Appellant's conduct created a grave risk of death to another person, namely Burse, because Burse was not in the line of fire when Appellant shot Neal. This claim is without merit. The Commonwealth offered sufficient evidence that Appellant created a grave risk of death to Burse through its proofs that he fired three shots at Neal with Burse only a few feet away, as "it is not necessary that the endangered bystander be directly in the line of fire for a grave risk of death to occur. The potential for an errant, ricochet, or pass-through bullet can create the requisite risk." *Commonwealth v. Rios*, 546 Pa. 271, 295–96, 684 A.2d 1025, 1037 (1996) (holding that the defendant created a grave risk of death to other persons where he fired a fatal bullet at the victim lying on the floor of the bedroom while another person was on the floor near the victim and two others were on a nearby bed) (citations omitted). At the time of the murder, Burse was asleep on a bed adjacent to Neal, in close enough proximity that a stray bullet could have caused his death. Moreover, given the testimony establishing the short period of time in

which the events occurred and the close connection between the shooting of the two victims, sufficient evidence was presented from which the jury could have concluded that Appellant created a grave risk of death to Burse during the murder of Neal when he shot Burse in the shoulder.[3] *See Johnson (William),* 542 Pa. at 409, 668 A.2d at 103 (upholding the aggravating circumstance where the defendant fired shots at the victim's uncle as he pursued the defendant following the murder); *Commonwealth v. Robinson,* 554 Pa. 293, 315, 721 A.2d 344, 355 (1998) (finding the aggravating circumstance applicable where the defendant shot a surviving victim in the living room before proceeding to the bathroom to kill her boyfriend), *cert. denied,* 528 U.S. 1082, 120 S.Ct. 804, 145 L.Ed.2d 677 (2000).

 The jury did not find that the third aggravating circumstance was present in this case; however, the failure of the jury to rely upon that factor does not mean that it was improperly submitted. The trial court may instruct the jury on "aggravating circumstances for which there is *some evidence.*" *See Commonwealth v. Buck,* 551 Pa. 184, 191, 709 A.2d 892, 896 (1998) (emphasis in original). As there was some evidence introduced at trial to show that Appellant had been involved in drug transactions, specifically, the testimony of Appellant's ex-girlfriend, the trial court did not err in submitting this circumstance for consideration by the jury. Furthermore, "reversal of a defendant's sentence is not war-

---

**3.** Appellant relies on *Commonwealth v. Wheaton,* 13 Pa. D. & C.4th 146 (Pa.Com.Pl. 1991), for the proposition that the shooting of a second victim who survives is not an aggravating circumstance where the shootings occurred several minutes apart, although in the same house. *Wheaton* is not factually analogous to the instant case, nor does it stand for the rule for which Appellant cites it. In *Wheaton,* the defendant first shot a surviving victim in the living room, then proceeded to a second room of the house, where he argued for several minutes with the second victim before taking her to a third location inside the residence and fatally wounding her. This situation is distinct from the one now before the Court, in which the shootings were closer in their physical and temporal relation.

We also observe that Appellant challenges only the sufficiency of the evidence supporting this circumstance and makes no claim of trial court error.

ranted by submitting an aggravating circumstance to the jury if the jury does not find beyond a reasonable doubt the existence of that improper aggravating circumstance in rendering its verdict of death since such error is harmless." *Jones,* 542 Pa. at 522, 668 A.2d at 519. Consequently, all three aggravating circumstances were properly submitted to the jury, and the evidence was sufficient to support the jury's finding with regard to circumstances one and two.

Finally, having dismissed Appellant's claims of error and concluded that the evidence supports the aggravating circumstances found by the jury, this Court has a duty to uphold the sentence of death, unless we determine that it was the product of passion, prejudice, or any other arbitrary factor. *See* 42 Pa.C.S. § 9711(h)(3). Upon thorough review of the record, we conclude that the sentence was not the result of any such impermissible factor.

Accordingly, we affirm the verdict and sentence of death imposed upon Appellant, Jonathan Lamar Fisher, by the Court of Common Pleas of Montgomery County.[4]

---

4. The Prothonotary of the Supreme Court is directed to transmit the complete record of this case to the Governor of Pennsylvania. *See* 42 Pa.C.S. § 9711(i).