J-S02041-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : : : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | | |
| BIAS T. ROBINSON | | |
| Appellant | | No. 1735 EDA 2017 |

Appeal from the Judgment of Sentence April 11, 2017
In the Court of Common Pleas of Bucks County Criminal Division at
No(s):  CP-09-CR-0003494-2016

BEFORE:   BOWES, J., NICHOLS, J., and RANSOM*, J.

MEMORANDUM BY RANSOM, J.:                    **FILED MARCH 29, 2018**

Appellant, Bias T. Robinson, appeals from the judgment of sentence, imposed April 11, 2017,[1] following a jury trial resulting in his conviction for recklessly endangering another person ("REAP"), simple assault, and disorderly conduct.[2]  We affirm.

The instant convictions result from an incident in February 2016, wherein Appellant fired four shots into the air following a scuffle at the Stadium Bar in Bucks County.  As part of his omnibus pretrial motion, Appellant moved to suppress the in- and out-of-court identifications of two

_____

[1] Appellant purports to appeal from the order denying his post-sentence motion.  Appellant's appeal properly lies from the judgment of sentence entered on April 11, 2017, not the order denying his post-sentence motion. ***See Commonwealth v. Dreves***, 839 A.2d 1122, 1125 n.1 (Pa. Super. 2003) (*en banc*).

[2] 18 Pa.C.S §§ 2705, 2701(a)(3), and 5503(a)(1), respectively.

*   Retired Senior Judge assigned to the Superior Court.

eyewitnesses to the incident, Lori Griffith ("Ms. Griffith") and Anthony Donahue ("Mr. Donahue"). Appellant averred that the photographic array of eight individuals was unduly suggestive and created a risk of misidentification but offered no facts in support of this claim. Omnibus Pre-trial Motion 1/18/2017. The Commonwealth established the following facts.

Ms. Griffith and Mr. Donahue were at the Stadium Bar together and were present at 2:00 a.m. when the incident occurred. Notes of Testimony (N.T.), 1/30/2017, at 21, 35, 61-62. It was a clear night, and the area surrounding the bar was well lit by lights from the bar and the ACME grocery store and adjacent parking lot across the street. *Id*. at 25. Mr. Donahue sometimes worked as a bouncer at the bar. *Id*. at 35, 62. A scuffle broke out in the bar. *Id*. at 36. Ms. Griffith was standing in the vicinity of the doorway when she saw Mr. Donahue holding a person by the shoulders, whom he helped escort from the bar following the scuffle. *Id*. at 37. Appellant, who was unfamiliar to Ms. Griffith, was yelling, "That is my fucking brother." *Id*. at 35-38. Ms. Griffith observed Appellant for approximately thirty to forty seconds, wherein she witnessed Appellant run toward the ACME parking lot and disappear. *Id*. at 23-24, 37-40, 51. Appellant was unfamiliar to Ms. Griffith. *Id*. 35-36. Shortly thereafter, Ms. Griffith heard two gunshots, looked to the source of the sound, and saw Appellant about forty feet away in the parking lot of the Stadium Bar. *Id*. at 51-52. She could see the side of his face. *Id*. at 47. Ms. Griffith recognized him as the same person she saw earlier and observed his face for another thirty seconds as he fired two more shots in the air. *Id*.

at 23-24, 37. The crowd dispersed following the first two shots. *Id*. at 41, 69.

Officer Thomas Polistina ("Officer Polistina") arrived on the scene in his patrol vehicle and questioned both Mr. Donahue and Ms. Griffith. Approximately two hours after the incident, Ms. Griffith identified Appellant as the shooter when she viewed a picture of Appellant displayed on a computer monitor in Officer Polistina's patrol car.[3] *Id*. at 29. Ms. Griffith testified that when asked whether the individual on the computer monitor was the shooter, she confirmed without hesitation and was "one hundred percent sure it was

_____

[3] At trial, Officer Polistina testified that he arrived on the scene within minutes of the shots being fired and commenced an investigation by interviewing individuals still at the Stadium Bar. N.T., 1/31/2017, at 203-20. He first interviewed Mr. Donahue who indicated by pointing that Appellant's brother, Dayshawn Robinson ("Dayshawn"), was involved in the scuffle; related that someone was yelling, "that's my fucking brother"; and recognized the shooter as a male who was with Dayshawn earlier that evening. *Id*. at 205-08. Based upon Donahue's statements, Officer Polistina also interviewed Dayshawn, who tendered Appellant's name while reporting his handgun stolen. *Id*. at 210-20. Dayshawn explained that his gun was originally in his girlfriend's purse when he met with his brother at the bar and that she and Appellant ended up outside following the scuffle. *Id*. at 213-14. Officer Polistina asked Dayshawn if it was possible that the gun was not stolen, but instead that Appellant had the gun. *Id*. at 214-15. Dayshawn conceded it was possible. *Id*. Dayshawn's girlfriend separately corroborated that she and Appellant were outside following the scuffle and confirmed it was possible that Appellant had taken her purse. *Id*. at 217-19. Officer Polistina began to draft his report of the incident on the computer in his police car when he endeavored to call individuals who contacted 911. *Id*. at 220-21. One of these calls led him to Ms. Griffith who was also still on the scene. *Id*. Appellant's face sheet, which featured identifying information of Appellant and a photo of him, was displayed on Officer Polistina's computer monitor when he and Ms. Griffith converged. *Id*. at 223.

[Appellant]." *Id*. at 28-29, 34, 45. Ms. Griffith described the shooter as a tall, light-skinned black gentleman. *Id*. at 23.

Ms. Griffith was shown a photo array of eight individuals approximately two weeks after the incident. *Id*. at 30-31. Ms. Griffith testified that she immediately selected Appellant's photograph, as she recognized him "right away." *Id*. at 30-31. She further testified that she identified the photograph because she recognized Appellant from the shooting, and not because she saw Appellant's photo in Officer Polistina's patrol car. *Id*. at 32. Ms. Griffith did not recall if the photograph in the array was the same picture of Appellant as she had seen in Officer Polistina's car. *Id*. at 49.

Mr. Donahue testified that he believed he was pushing Appellant's brother out of the doorway because Appellant, who was also unfamiliar to him, kept saying, "Get off my brother. Don't touch my brother." *Id*. at 62-64, 66-70, 75. Mr. Donahue observed Appellant dart off and return in the direction of the crowd gathered outside the bar. *Id*. at 64. A crowd of patrons was ushered out of the bar and gathered in the middle of the road. Appellant was in the middle of the street and fired two gunshots into the air. *Id*. at 66-70, 72-73. Mr. Donahue estimated that he was about forty feet away from Appellant when he witnessed the shots fired. *Id*. at 77. Mr. Donahue testified that Appellant fired the shots "straight in the air" as Appellant headed back towards the bar. *Id*. at 73. Mr. Donahue testified that after the first two shots were fired he returned to the inside of the bar because he was scared for his life. *Id*. at 70-76. Mr. Donahue described the shooter as a black male

wearing dark clothing. *Id*. at 71. When later presented with a photo array, Mr. Donahue also testified that he immediately selected Appellant's photograph out of the array of eight individuals. *Id*. at 60-61.

Detective Alexander Asmann ("Detective Asmann") of the Bristol Township Police Department conducted the photo array identification process with both Ms. Griffith and Mr. Donahue on the same day. *Id*. at 79. Ms. Griffth and Mr. Donahue were in separate rooms when shown the same photo array of eight individuals.[4] *Id*. at 99. Detective Asmann testified that the photographs used in the array were populated from the JNET lineups menu, which allowed him to insert "basic data to obtain candidates that match the suspect's demographics; in other words, his age, race, height, weight, hair style." *Id*. at 81-82. Detective Asmann testified that when he showed the photo array to each witness in turn, Ms. Griffith immediately selected Appellant as did Mr. Donahue. *Id*. at 82-83. Ms. Griffith and Mr. Donahue each signed the back of the respective photographs that they selected, confirming that they had identified that specific photo from the array as depicting the individual who fired the gun multiple times adjacent to the Stadium Bar. *Id*. at 87-88.

At the conclusion of the hearing, the court issued findings of fact and conclusions of law. *Id*. at 93-101. The trial court noted that Ms. Griffith

---

[4] The single photo array shown to both witnesses was entered into evidence and included in the exhibits forwarded to this Court. *Id*. at 80-81; Commonwealth's Exhibit CS-2.

positively identified Appellant (when she viewed his photograph in Officer Polistina's car) even before she provided a description of the shooter. *Id*. at 96. The trial court denied Appellant's motion to suppress, concluding that the photographic array presented was not unduly suggestive and did not taint any subsequent identification by Ms. Griffith or Mr. Donahue. *Id*. at 100. To be clear, Appellant did not argue at any time before trial that Ms. Griffith's initial identification to Officer Polistina was improper.

At trial, Ms. Griffith and Mr. Donahue again identified Appellant as the shooter. Both testified that they were "one hundred percent sure." N.T., 1/31/2017, at 36-37, 91. The testimony of Ms. Griffith and Mr. Donahue was consistent with the testimony elicited at the suppression hearing, and the following additional facts were introduced.

Ms. Griffith could see Appellant's full face when she initially observed him. *Id*. at 14-15, 53. She estimated that approximately ten to fifteen people gathered in the Stadium Bar parking lot after being ushered out of the establishment. *Id*. at 16-18. When she witnessed Appellant fire the second two shots into the air, he was standing near the sidewalk adjacent to the Stadium Bar with his back towards the bar. *Id*. at 19-21. She could see the left side of Appellant's face at the time. *Id*. at 19-20. Appellant pointed the gun in the air, "away from the crowd and into the parking lot of the grocery store." *Id*. at 20. When asked if the gun was parallel to the ground, Ms. Griffith clarified that the gun was "more in the air[; it] wasn't parallel." *Id*.

Mr. Donahue testified at trial that he was helping push people out of the bar following the scuffle. *Id*. at 68. Specifically, as he was pushing one of the males out of the bar, he heard Appellant repeatedly saying, "get that fucker of meat off my brother."[5] *Id*. at 69. When Mr. Donahue first saw Appellant he was five to ten feet away. *Id*. at 70. Mr. Donahue was able to view Appellant for about two minutes before Appellant ran towards the ACME. *Id*. at 73-74. Mr. Donahue estimated he observed Appellant for a minute when Appellant fired the first two shots from about forty to fifty feet away. *Id*. at 75-77. The ten to fifteen people outside scattered after the first two shots. *Id*. at 76. When police arrived on the scene, Mr. Donahue described the shooter as a black male in his mid-twenties with lighter skin, of medium build who was about six feet tall. *Id*. at 80.

Dayshawn testified that he was present at the Stadium Bar when shots were fired. *Id*. at 115-17. He met Appellant there. *Id*. at 126, 145. Dayshawn had a license to carry a firearm and placed his Smith & Wesson handgun into his girlfriend's purse to get the gun into the bar. *Id*. at 118-19. The gun was loaded with .40 caliber ammunition at the time. *Id*. at 119. After the shots were fired, Dayshawn realized his firearm was missing. *Id*. at 122-23. When police arrived to investigate the incident, he reported his gun missing. *Id*. at 116-17.

---

[5] It is unclear from the trial testimony whom Mr. Donahue escorted out of the bar.

Detective Timothy Fuhrman testified that on March 5, 2016, he recovered a Smith & Wesson handgun loaded with .40 caliber ammunition from a car parked outside of the Stadium Bar. *Id*. at 173-176. The gun was registered to Dayshawn. *Id*. at 180. Forensics analysis determined that three, .40 caliber cartridge casings recovered from the scene on the morning of the shooting were fired from Dayshawn's gun. *Id*. at 187-91, 200.

In February 2017, the jury found Appellant guilty of the aforementioned charges. In April 2017, Appellant was sentenced to six to twenty-three months of incarceration on the REAP plus two years of probation on the simple assault to run consecutively.[6] No further penalty was imposed on the disorderly conduct charge. Appellant timely filed a post-sentence motion to reconsider sentence, which the trial court denied following a hearing. At the reconsideration hearing, Appellant apologized for firing into the air and acknowledged that someone could have been hurt. N.T., 5/3/2017, at 4-7. Trial counsel was permitted to withdraw, and the court appointed the Bucks County Public Defender's Office to represent Appellant.

Appellant timely appealed and filed a court-ordered Pa.R.A.P. 1925(b) statement. The trial court issued a responsive opinion.

Appellant presents the following questions for our review:

1.    Whether the evidence was insufficient to establish the elements of the crimes of recklessly endangering another person

---

[6] Further, upon parole, Appellant was prohibited from possessing any firearm or having any contact with the two eyewitnesses, and was required to maintain a verifiable address. N.T., 4/11/2017, at 18-19.

- 8 -

and simple assault where the Commonwealth evidence was that the Appellant discharged a firearm into the air and not towards another person?

2. Whether the trial court erred in denying the defense's motion to suppress the in[-]and out-of–court identifications of the [Appellant], where the photograph array was unduly suggestive and there was no independent basis for the in-court identification?

Appellant's Brief at 4.

In his first issue, Appellant claims that the evidence was insufficient to sustain his convictions for REAP and simple assault. *See* Appellant's Brief at 12-20. Specifically, Appellant contends that the evidence failed to show that his actions presented an actual present ability to inflict harm on any bystander in the crowd or that he acted with a conscious disregard of a known risk. *Id*. at 15. Additionally, Appellant asserts that the Commonwealth failed to prove he intended to menace individuals in the crowd. *Id*. at 17-19.

We review a challenge to the sufficiency of the evidence as follows.

In determining whether there was sufficient evidentiary support for a jury's finding [], the reviewing court inquires whether the proofs, considered in the light most favorable to the Commonwealth as a verdict winner, are sufficient to enable a reasonable jury to find every element of the crime beyond a reasonable doubt. The court bears in mind that: the Commonwealth may sustain its burden by means of wholly circumstantial evidence; the entire trial record should be evaluated and all evidence received considered, whether or not the trial court's rulings thereon were correct; and the trier of fact, while passing upon the credibility of witnesses and the weight of the evidence, is free to believe all, part, or none of the evidence.

*Commonwealth v. Diggs*, 949 A.2d 873, 877 (Pa. 2008) (citations omitted).

A person commits the crime of recklessly endangering another person if he engages in conduct which places or may place another person in danger of death or serious bodily injury. 18 Pa.C.S. § 2705.

> Our law defines "serious bodily injury" as "bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ." 18 Pa.C.S § 2301. To sustain a conviction under section 2705, the Commonwealth must prove that the defendant had an actual present ability to inflict harm and not merely the apparent ability to do so. Danger, not merely the apprehension of danger, must be created. The mens rea for recklessly endangering another person is "a conscious disregard of a known risk of death or great bodily harm to another person." *Commonwealth v. Peer*, 684 A.2d 1077, 1080 (Pa. Super. 1996).

*Commonwealth v. Hopkins*, 747 A.2d 910, 915–16 (Pa. Super. 2000) (some internal citations omitted).

The crime "requires (1) a mens rea recklessness, (2) an actus reus some 'conduct,' (3) causation 'which places,' and (4) the achievement of a particular result 'danger,' to another person, of death or serious bodily injury." *Commonwealth v. Reynolds*, 835 A.2d 720, 726 (Pa. Super. 2003); *see also Commonwealth v. Hartzell*, 988 A.2d 141 (Pa. Super. 2009) (determining evidence was sufficient to support appellant's conviction for REAP where appellant consciously disregarded known risk when he pointed rifle in general direction of two men standing and purposefully shot into shallow water twenty-five to thirty feet away from them); *contra Commonwealth v. Kamenar*, 516 A.2d 770 (Pa. Super. 1986) (determining evidence was insufficient to sustain appellant's REAP conviction in view of

complete absence of evidence that discharge of gun out of rear window of home, into wooded hillside behind home, placed or may have placed any other person in danger of death or seriously bodily injury); *Commonwealth v. Smith*, 447 A.2d 282 (Pa. Super. 1982) (determining evidence was insufficient to sustain appellant's REAP conviction where there was no evidence that appellant fired rifle at his neighbor or that neighbor was placed in any danger of death or serious bodily injury).

Viewing the evidence in the light most favorable to the Commonwealth as verdict winner, the evidence was sufficient to find Appellant guilty of REAP. Both Ms. Griffith and Mr. Donahue testified that the crowd of patrons from the Stadium Bar began to disperse from the parking lot only after Appellant had fired the first two shots. Although the Appellant did not point or shoot the firearm in the direction of any single person, Appellant created actual danger to approximately ten to fifteen people congregated outside of the Stadium Bar when he repeatedly fired into the open air above them. It was reasonably foreseeable that a bullet fired straight into the air from Appellant's gun, a deadly weapon, through the force of gravity would fall back down to the earth and potentially strike a member of the crowd in the process causing serious bodily injury or death. *Reynolds*, 835 A.2d at 726; *See* 18 Pa.C.S § 2301 (defining a deadly weapon as "[a]ny firearm, whether loaded or unloaded, or any device designed as a weapon and capable of producing death or serious bodily injury."). Thus, the evidence was sufficient to establish that Appellant acted with a conscious disregard of a known risk.

A person is guilty of simple assault if he "attempts by physical menace to put another in fear of imminent serious bodily injury." 18 Pa.C.S. § 2701(a)(3).

> In order to prove the crime of simple assault by physical menace, the Commonwealth must establish the following elements: (1) that the defendant attempted to put [another] in fear of imminent serious bodily injury, and took a substantial step toward that end, (2) that the defendant used physical menace to do this, and (3) that it was the defendant's conscious object or purpose to cause fear of serious bodily injury.

*Commonwealth v. Little*, 614 A.2d 1146, 1151 (Pa. Super. 1992). In *Little*, this Court concluded that the appellant's emergence from her home while toting a shotgun, shouting, and advancing from her porch was sufficient to establish simple assault by physical menace to put another in fear of imminent serious bodily injury. *Id*.

Again viewing the evidence in the light most favorable to the Commonwealth, the evidence was sufficient to find Appellant guilty of simple assault. Here, it is undisputed that Appellant's brother Dayshawn was at the Stadium Bar at the time of the incident. Both Ms. Griffith and Mr. Donahue heard Appellant repeatedly shout demands that some party present get off his brother. In response to the perceived transgression against Dayshawn, Appellant then proceeded to fire two shots into the air while running across the street into the crowded parking lot of the bar. As the crowd disbursed, Appellant fired two more shots from the bar's parking lot into the air in the

direction of the ACME parking lot. Ms. Griffith and Mr. Donahue both testified that they were "one hundred percent" sure that Appellant was the shooter.

As in *Little*, Appellant's target and objective were apparent: to influence any number of the ten to fifteen people present to leave Dayshawn alone. Appellant utilized a deadly weapon to accomplish his goal. *Hopkins*, 747 A.2d at 914 ("The threat posed by the appearance of a firearm is calculated to inflict fear of deadly injury, not merely fear of 'serious bodily injury.'") (citing *Commonwealth v. Thomas*, 546 A.2d 116, 119 (Pa. Super. 1988)).[7] Thus, the evidence presented was sufficient to establish that through his speech and actions, Appellant intended to place any number of the ten to fifteen people present in fear of imminent serious bodily injury, as it is well settled that a deadly weapon is capable of producing death or serious bodily injury. Accordingly, Appellant's sufficiency challenge is without merit.

In his second issue, Appellant asserts the court erred in denying his motion to suppress where the identification process was unduly suggestive, unreliable, and tainted the subsequent in-court identifications. Appellant's Brief at 20-21. Specifically, Appellant contends for the first time on appeal

_____

[7] In his brief, Appellant notes that it is equally plausible based on the testimony that the shooter intended to break up an escalating fight and seemingly achieved the desired effect. Appellant's Brief at 18. However, regardless of the motivation, this characterization of the facts elicited at trial indeed illustrates a specific intent to use a weapon capable of deadly force to prompt another to take a desired action. *Little*, 614 A.2d at 1151.

that the identification process was tainted at the outset of the investigation when Officer Polistina showed Ms. Griffith a photograph of Appellant and asked if Appellant was the shooter before Ms. Griffith had provided a description of the shooter. *Id*. at 26. According to Appellant, this initial identification by Ms. Griffith prevented her and Mr. Donahue from having an independent basis for identifying Appellant.[8] *Id*. at 24-28. Alternatively, Appellant renews his assertion that the photo array was unduly suggestive, claiming that Ms. Griffith and Mr. Donahue lacked an independent basis for their in-court identifications, as both were unable to describe characteristics of Appellant or his clothing in detail at the time they viewed the photo array. *Id*. at 24-27.

As an initial matter, we note that Appellant never challenged Ms. Griffith's initial identification in his motion to suppress or at the suppression hearing, and thus, has waived this issue. Pa.R.A.P. 302(a) ("Issues not raised before the lower court are waived and cannot be raised for the first time on appeal."). Further, Appellant failed to preserve this claim in his Rule 1925(b) statement. *Commonwealth v. Hill*, 16 A.3d 484, 494 (Pa. 2011); Pa.R.A.P.1925(b)(4)(vii). As such, our review is limited to Appellant's

---

[8] Appellant noted that it was unclear whether the initial photograph shown to Ms. Griffith was subsequently included in the photo array presented to her and Mr. Donahue. Appellant's Brief at 23-25. Appellant claims that the photo's potential inclusion in the photo array would continue the taint of the identification. However, as the facts on this matter are ambivalent, and given our disposition of Appellant's claim regarding Ms. Griffith's initial identification, we decline to address this argument.

challenges regarding the potential suggestiveness of the photo array and subsequent in-court identification.[9]

We review the denial of a suppression motion as follows:

Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct.

[W]e may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the court erred in reaching its legal conclusions based upon the facts.

*Commonwealth v. Williams*, 941 A.2d 14, 26-27 (Pa. Super. 2008) (*en banc*) (internal citations and quotation marks omitted).

"Photographic identification of a person is unduly suggestive if, under the totality of the circumstances, the identification procedure creates a substantial likelihood of misidentification." *Commonwealth v. Crork*, 966 A.2d 585, 588 (Pa. 2009). "Following a suggestive pre-trial identification, a

_____

[9] Even if Appellant had not waived his challenge of Ms. Griffith's initial identification to Officer Polistina, it is well-settled that absent some special element of unfairness, prompt one-on-one identification is permissible, as it enhances the reliability of the identification. *See Commonwealth v. Hale*, 85 A.3d 570, 574 (Pa. Super. 2014), *affirmed*, 128 A.3d 781 (Pa. 2015) (affirming conviction based on victim's one-on-one identification of appellant viewed wearing handcuffs, on location where police investigating the burglary found appellant attempting to retrieve victim's discarded, stolen television); *Commonwealth v. Armstrong*, 74 A.3d 228, 239 (Pa. Super. 2013), *affirmed*, 107 A.3d 735 (Pa. 2014); *Commonwealth v. Wade*, 33 A.3d 108, 114 (Pa. Super. 2011); *Commonwealth v. Moye*, 836 A.2d 973, 976–78 (Pa. Super. 2003); *Commonwealth v. Carter*, 643 A.2d 61, 71 (Pa. 1994).

witness will not be permitted to make an in-court identification unless the prosecution establishes by clear and convincing evidence that the identification was not induced by events occurring between the time of the crime and the in-court identification." **Carter**, 643 A.2d at 71 (citing **Commonwealth v. Rodgers**, 372 A.2d 771 (Pa. 1977)). "When analyzing the admission of identification evidence, a suppression court must determine whether the challenged identification has sufficient *indicia* of reliability." **Commonwealth v. Sanders**, 42 A.3d 325, 330 (Pa. Super. 2012) (internal citation and quotation marks omitted).

> In determining whether an independent basis for identification exists, we must consider the following factors: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.

**Carter**, 643 A.2d at 71 (citing **Commonwealth v. James**, 486 A.2d 376 (Pa. 1985)). "Suggestiveness in the identification process is but one factor to be considered in determining the admissibility of such evidence and will not warrant exclusion absent other factors." **Wade**, 33 A.3d at 114 (quoting **McElrath v. Commonwealth**, 592 A.2d 740, 742 (Pa. Super. 1991)). Additionally, "[p]hotographs used in line-ups are not unduly suggestive if the suspect's picture does not stand out more than the others, and the people depicted all exhibit similar facial characteristics." **Commonwealth v. Fisher**, 769 A.2d 1116, 1126 (Pa. 2001).

In the instant matter, at the suppression hearing the trial court found that the photo array shown to Ms. Griffith and Mr. Donahue was not unduly suggestive and concluded that each witness had an independent basis for identification. N.T., 1/30/2017, at 100-101. We agree. The totality of the circumstances surrounding Appellant's identification by both witnesses rendered them reliable. Ms. Griffith and Mr. Donahue had sufficient time to observe the Appellant at the time of the crime. Ms. Griffith initially observed Appellant's full face for approximately thirty to forty seconds, and after losing sight of him briefly, she observed him for another thirty seconds when the sound of gunfire drew her attention to his position. She could see the left side of Appellant's face at this time. Mr. Donahue testified that he watched Appellant for two minutes prior to Appellant darting off, and observed him again as Appellant ran towards the Stadium Bar parking lot. Ms. Griffith and Mr. Donahue had a clear view of Appellant's face, which was uncovered, and the area was well lit. Both witnesses, who were in relatively close proximity to Appellant, demonstrated a high degree of attention in the matter, as they were able to recount the Appellant's movements and statements throughout the duration of the incident. Both witnesses described the position of the gun at the respective time they witnessed shots fired.

Each witness remained consistent in their description of Appellant. Mr. Donahue described the shooter as a black male wearing black clothing. Mr. Donahue rendered a description of Appellant independent from Ms. Griffith directly after the incident and did not see a photograph that night. Ms. Griffith

described the shooter as a tall, light-skinned black gentleman wearing a long-sleeve, lighter shirt.

The identical photographic array to Ms. Griffith and Mr. Donahue did not create a substantial likelihood of misidentification as (1) the array contained photographs of eight black men who appeared to be of similar age (2) the array was computer-generated based on the descriptions of the shooter entered into the JNET program, and (3) the photo array was shown at most two weeks later to each witness in isolation.  *Fisher*, 769 A.2d at 1126.  Additionally, both witnesses displayed a high level of certainly in their identifications to Detective Asmann.

Thus, the identifications of Mr. Donahue at the time of the photo array and at the suppression hearing, which were unequivocal and immediate, were distinctly separate from Ms. Griffith's identification at the time of the array and at the suppression hearing, which were also unequivocal and immediate.  Both witnesses never identified anyone other than Appellant and positively identified him at each opportunity to do so.  Accordingly, we conclude that both Ms. Griffith and Mr. Donahue had an independent basis for their identifications. *Carter*, 643 A.2d at 71

As such, the trial court's factual findings are supported by the record, and we discern no error in the legal conclusions drawn therefrom and the court's decision to admit the identification testimony.

Judgment of sentence affirmed.  Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/29/18