J-S33015-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOSHUA LEE DIEGDIO | : | |
| | : | |
| Appellant | : | No. 866 WDA 2022 |

Appeal from the Judgment of Sentence Entered March 18, 2022
In the Court of Common Pleas of Beaver County Criminal Division at
No(s):  CP-04-CR-0001795-2020

BEFORE:   BENDER, P.J.E., McCAFFERY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BENDER, P.J.E.:                **FILED: December 29, 2023**

Appellant, Joshua Lee Diegdio, appeals from the judgment of sentence of an aggregate term of life imprisonment, without the possibility of parole, imposed after a jury convicted him of first-degree murder, attempted murder, aggravated assault, burglary, robbery, and conspiracy to commit robbery.  On appeal, Appellant challenges the sufficiency of the evidence to sustain his convictions, the court's denial of his pretrial motion to suppress evidence, and the court's admission of certain evidence.  After careful review, we affirm.

The trial court set forth a detailed summary of the facts and procedural history of Appellant's case, which we adopt herein.  ***See*** Trial Court Opinion (TCO), 11/7/22, at 1-24.  Briefly, Appellant was convicted of the above-stated offenses based on evidence that he shot Latrell Parker and Alessandra Briggs

_____

[*] Former Justice specially assigned to the Superior Court.

during a home invasion in Beaver Falls, Pennsylvania, on September 25, 2020. While Parker unfortunately died from his wounds, Briggs survived and was able to testify against Appellant at his trial, identifying him as one of the two men who forcibly entered her home and shot her and Parker.

On March 2, 2022, the jury convicted Appellant of the above-stated crimes. On March 18, 2022, he proceeded to sentencing. Although the Commonwealth sought the death penalty in this case, the jury could not reach a verdict on that penalty and, therefore, the court imposed an aggregate term of life imprisonment, without the possibility of parole.

On March 28, 2022, Appellant filed a timely, post-sentence motion. On July 26, 2022 (120 days later), Appellant filed a notice of appeal. However, at no point between the filing of his post-sentence motion and the filing of his appeal did it appear that an order was entered formally denying the post-sentence motion. *See* Pa.R.Crim.P. 720(B)(3)(a) (stating that, when presented with a post-sentence motion, the trial court "shall decide the post-sentence motion … within 120 days of the filing of the motion. If the judge fails to decide the motion within 120 days … the motion shall be deemed denied by operation of law."); Pa.R.Crim.P. 720(B)(3)(c) (directing that, when the court fails to decide a post-sentence motion within 120 days, "the clerk of courts shall forthwith enter an order on behalf of the court … that the post-sentence motion is deemed denied"). An appeal filed after a timely, post-sentence motion is premature if the trial court has not yet entered an order disposing of the motion, or the clerk of courts has not entered an order

- 2 -

denying the motion by operation of law, as without any such order the judgment of sentence is not final. ***Commonwealth v. Claffey***, 80 A.3d 780, 783 (Pa. Super. 2013) (finding that, "when post-sentence motions are filed, the judgment of sentence does not become final until those motions are decided"). Such an appeal, therefore, should be quashed as not from a final order. ***Id.*** Accordingly, this Court entered a September 1, 2022 rule to show cause order directing Appellant to show cause why the instant appeal should not be quashed as premature.

On September 13, 2022, Appellant filed a response stating that a praecipe had been filed with the trial court pursuant to Pa.R.A.P. 301(d) (mandating that the clerk of the lower court shall prepare, sign, and enter appropriate orders upon praecipe of any party). The trial court's docket has now been updated, showing entries for a September 13, 2022 "Praecipe to Enter Order by Operation of Law," and a September 15, 2022 "Order Denying Post-Sentence Motion by Operation of Law."[1] Because there is now a final order denying Appellant's post-sentence motion, we find that the instant appeal was timely filed from that final order. ***See*** Pa.R.A.P. 905(a)(5) (stating that an initially premature notice of appeal shall be treated as filed on the date the appealable order is entered).

---

[1] We note that the court's September 15, 2022 order shows that it improperly attempted to back date the denial of Appellant's post-sentence motion to July 25, 2022.

- 3 -

Appellant thereafter complied with the trial court's order to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal, and the trial court filed a responsive Rule 1925(a) opinion on November 7, 2022. Herein, Appellant states four issues for our review:

> 1. The trial court erred by not granting Appellant's motion for judgement [*sic*] of acquittal, at the conclusion of the Commonwealth's case, on the basis that the Commonwealth failed to prove that … Appellant was the actual person that committed the following charges: first[-]degree murder, criminal attempt - murder of the first degree, aggravated assault, robbery – inflict serious bodily injury, burglary – overnight accommodations[,] … and conspiracy to commit robbery - inflict serious bodily injury….
>
> 2. The trial court erred by not granting Appellant's motion for judgement [*sic*] of acquittal, at the conclusion of the Commonwealth's case, on the basis that there was insufficient evidence to support all of the charges[ of:] first[-]degree murder, criminal attempt - murder of the first degree, aggravated assault, robbery – inflict serious bodily injury, burglary – overnight accommodations[,] … and conspiracy to commit robbery - inflict serious bodily injury.
>
> 3. The trial court erred and/or abused its discretion when it denied Appellant's omnibus pre-trial motion, including the motion to suppress the photo array of … Appellant and the motion to suppress any evidence seized from … Appellant's ZTE cellular phone.
>
> 4. The trial court erred and/or abused its discretion when it determined Appellant's statement about being treated like El Chapo was an admission and/or statement against interest and permitted the testimony of Deputy Sheriff[] Doug Hanna.

Appellant's Brief at 12-13 (unnecessary capitalization and footnote omitted).[2]

---

[2] Appellant indicates that his first two issues will be analyzed together and are supported by the same facts and law.  *See id.* at 13 n.1.

In assessing Appellant's claims, we have reviewed the briefs of the parties, the certified record, and the applicable law. We have also considered the thorough and well-reasoned opinion of the Honorable Mitchell P. Shahen of the Court of Common Pleas of Beaver County. We conclude that Judge Shahen's opinion correctly and cogently disposes of Appellant's issues and demonstrates that no relief is due.[3] Therefore, we adopt Judge Shahen's decision as our own, and affirm Appellant's judgment of sentence for the reasons set forth therein.

Judgment of sentence affirmed.

---

[3] We note that in Appellant's third issue, he contends that the photographic array shown to Brittany Lavette was unduly suggestive because he is Latino, and "[t]here were no other Latino men in the line-up." Appellant's Brief at 56. Judge Shahen does not address this argument in his opinion, as it was not raised in Appellant's omnibus pretrial motion to suppress. Therein, Appellant focused only on the fact that he was one of the only individuals in the array with visible tattoos on his neck. *See* Omnibus Pretrial Motion, 8/25/21, at 11 ¶ 38 (arguing that "[u]sing a photograph of [Appellant] as the only male with numerous tattoos is unduly suggestive and taints the identification"); *id.* at 11 ¶ 39 (stating that, "[a]t issue here is that while [Appellant's] photograph is similar in skin tone and hair style and color with the other photographs it is the only one with highly visible tattoos[,] … which uniquely and specifically draw attention to [Appellant]") (emphasis omitted); *id.* at 12 ¶ 41 ("Fatal to the Commonwealth is that [Appellant's] photograph is unduly suggestive as it portrays a characteristic unshared by other members depicted in the photographic array. This characteristic, namely the visible chest and neck tattoos, immediately draws attention to [Appellant] in a manner that is likely to induce a misidentification as it causes his photograph to stand out more than the others."). Moreover, Appellant does not point to where in the record of the suppression hearing that he raised the claim about his being the only Latino man in the lineup. Thus, Appellant has waived this argument on appeal. *See* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.").

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

12/29/2023

IN THE COURT OF COMMON PLEAS OF BEAVER COUNTY,
PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF
PENNSYLVANIA

       :
       :
       : CP-04-CR-01795-2020

vs.        :

       : 866 WDA 2022

JOSHUA LEE DIEGDIO   :

Shahen, Mitchell P.         NOVEMBER 7, 2022

## OPINION OF LOWER COURT PURSUANT TO PA.R.A.P. RULE 1925(a)

Joshua Lee Diegdio ("Appellant") appeals from the March 18, 2022, judgment of sentence entered by the Court of Common Pleas of Beaver County following his convictions by a jury on March 2, 2022, of Murder of the First Degree,[1] Criminal Attempt – Murder of the First Degree,[2] Aggravated Assault,[3] Robbery – Inflict Serious Bodily Injury,[4] Burglary – Overnight Accommodations;

---

[1] 18 Pa. C.S. § 2502(a)
[2] 18 Pa. C.S. § 901(a); 18 Pa. C.S. § 2502(a)
[3] 18 Pa. C.S. § 2702 (a)(1)
[4] 18 Pa. C.S. § 3701(a)(1)(i)

Person Present, Bodily Injury Crime,[5] and Conspiracy – Robbery – Inflict Serious Bodily Injury.[6]

On December 10, 2020, the Commonwealth filed its notice of intention to seek the death penalty citing two aggravating factors in the event of a conviction of first degree murder pursuant to the Sentencing Code, 42 Pa. C.S. § 9711.

Following the death penalty phase, the jury was unable to reach a verdict as to the penalty. On March 18, 2022, the court sentenced the Appellant to a term of life imprisonment on the first degree murder conviction. Sentences on the remaining charges were ordered to run concurrently or merged with corresponding offenses.

The Appellant filed a timely post-sentence motion on March 28, 2022, and a supplemental post-sentence motion by permission on May 9, 2022. The relevant facts and procedural history follow below.

## FACTS AND PROCEDURAL HISTORY

The charges against the Appellant stem from an incident occurring at the home of Latrell Parker and Alessandra Briggs, 1403 5th Ave, Beaver Falls, PA ("Premises"), in the early morning hours of September 25, 2020. This incident involved the invasion of the home and shooting death of victim Latrell Parker ("Parker"), and the shooting of victim Alessandra Briggs ("Ms. Briggs").

---

[5] 18 Pa. C.S. § 3502(a)(1)
[6] 18 Pa. C.S. § 903(a)(1); 18 Pa. C.S. § 3701(a)(1)(i)

By Criminal Information dated December 2, 2020, the Appellant was charged as follows, one (1) Count of Murder of the First Degree (First Degree Felony);[7] one (1) Count of Murder of the Second Degree (First Degree Felony);[8] one (1) Count Criminal Attempt—Murder of the First Degree;[9] one (1) Count Aggravated Assault;[10] one (1) Count Robbery—Inflict Serious Bodily Injury;[11] one (1) Count Burglary—Overnight Accommodations: Person Present, Bodily Injury Crime; and one (1) Count Conspiracy—Robbery—Inflict Serious Bodily Injury.[12]

The Appellant filed an Omnibus Pre-Trial Motion on August 25, 2021, consisting of a (1) Motion to Suppress the Search Warrant for Appellant's Facebook Account, (2) Motion to Suppress the Search Warrant for Appellant's Cellular Telephone, and (3) Motion to Suppress the Identification of the Appellant stemming from a Photo Array. Appellant has appealed the suppression court rulings which denied the Motion to Suppress the Identification and the Motion to Suppress the Search Warrant for Appellant's Cellular Telephone.

A hearing on the omnibus motion was held on November 15, 2021, at which time the Commonwealth presented testimony from Detective Justin Schlie and Detective Timothy Higby of the City of Beaver Falls Police Department, as well as testimony from Detective Roger Patrick Young of the Beaver County District

---

[7] 18 Pa. C.S.A. §2502(a)
[8] 18 Pa. C.S.A. §2502(b)
[9] 18 Pa. C.S.A. §901(a)
[10] 18 Pa. C.S.A. §2702(a)(1)
[11] 18 Pa. C.S.A. §3502
[12] 18 Pa. C.S.A. §903

Attorney's Office. Detective Schlie testified to the required protocol for arranging photographic arrays, the software used, and the process he followed.

On December 30, 2021, the Court issued an Order denying the Appellant's Omnibus Pre-Trial Motion. The relevant findings are summarized as follows:

## Motion to Suppress the Photo Array and Subsequent Identification by Brittany Lavette

...

This court finds that the background of each photo is similar, each photo is a headshot, the facial features of all of the men are similar and all of the men depicted appear to be of a similar age. The men have similar facial characteristics, facial hair, and hairlines. There is a mild variation in the complexion of the individual shown in photograph five (5) and the photograph of the Appellant shows a tattoo on his neck while the only other man with an observable tattoo was the man in photograph two (2). The complete neckline of the men in the photographs one (1), five (5) and seven (7) are partially obstructed so that no neck tattoos are observable and the remaining men in the photographs have no neck tattoos. These variations did not make Appellant's photograph stand out more than others.

...

In this case, in considering the totality of the circumstances, the court concludes that Brittany Lavette's out-of-court identification was not based upon a photo array so infected by suggestiveness as to give rise to a substantial likelihood of irreparable misidentification. The array was computer generated, the backgrounds were the same and the court finds that all of the men in the photo array exhibited similar facial characteristics.

## Motion to Suppress Items Seized through Search Warrant

...

In this case, the court having previously decided that it will not disturb the finding of probable cause of the issuing authority to search the cell phone, the court, based on the recent authority of *Green*,[13] finds that the items requested on pages one (1) and six (6) of the search warrant

---

[13] Referencing, *Commonwealth v. Green*, 265 A.3d 541, 551 (Pa. 2021).

for the cell phone are not in violation of the particularity requirement of Article 1 Section 9 of the Pennsylvania Constitution.[14]

Jury selection began on February 7, 2022, and the trial was conducted from February 16, 2022 to March 1, 2022. On March 2, 2022, the Jury returned a verdict finding the Appellant guilty on Count I, II, V, VI, and VII. The Jury did not impose the death penalty.

The Appellant was sentenced on March 18, 2022. The Appellant was sentenced on Count I to life imprisonment in a State Penal or Correctional Institution or Facility, without the possibility of parole; ten to twenty years on Count II, to run concurrently with the sentence imposed at Count I; ten to twenty years on Count V, to run concurrently with the sentence imposed at Count I; seven to twenty years on Count VI, to run concurrently with the sentence imposed on Count I; seven to twenty years on Count VII, to run concurrently with the sentence imposed on Count I. No sentence was imposed for Count IV, as it was deemed to have merged with the sentence imposed on Count II.

The Appellant filed a Post-Sentence Motion for Relief following sentencing on March 28, 2022. A Notice of Appeal was filed by the Appellant on July 26, 2022. The Appellant was ordered to file a Concise Statement of Matters Complained of on Appeal on July 28, 2020. The Appellant timely filed a Concise

---

[14] Order in Response to Appellant's Omnibus Pre-Trial Motion, December 30, 2021, *Commonwealth v. Joshua Lee Diegdio,* CP-04-CR-01795-2020

Statement of Matters Complained on Appeal and a Concise Statement of Errors Complained on Appeal on August 9, 2022.

## TRIAL

The Commonwealth called multiple witnesses during their case in chief. For purposes of this opinion, testimony of Alessandra Briggs, Justin Laneve, Justin Schile, Bonnie Sedlacek, Daniel Viscuso, Timothy Higby, and Michael Motton will be summarized.

On February 16, 2022, Alessandra Briggs ("Ms. Briggs") was called by the Commonwealth to testify. Ms. Briggs testified that she had been in a relationship with Latrell Parker ("Parker") for almost two years and that they had been living together at the Premises for about a month at the time of the incident.[15]

Ms. Briggs testified that she knew of Parker's friends, and that one of Parker's friends, Michael Waters ("Waters"), lived three houses down from the Premises.[16] Ms. Briggs stated that Parker socialized and hung out at Waters' house frequently.[17]

Ms. Briggs testified that she knew of a man nicknamed "Pun" who was an acquaintance of Parker, but that she did not have a friendship or relationship with him. Ms. Briggs testified that she had seen Parker briefly interact with Diegdio,

---

[15] Transcript of Record: February 16, 2022, at 177, *Commonwealth v. Diegdio,* (2022) (No. 1795 of 2020).
[16] *Id.* at 180.
[17] *Id.* at 183.

stating that Parker had given Diegdio an eighth of marijuana before the incident.[18]

Ms. Briggs identified Pun as the Appellant, Joshua Diegdio, during her courtroom testimony.[19]

Ms. Briggs testified that on the day of the incident, she worked until 7:00 PM and when she returned home Parker was out playing basketball. When Parker did arrive home later, Ms. Briggs and Parker ate dinner and retired to bed around 11:00 P.M.[20] Ms. Briggs testified that she was woken up a couple hours later by loud banging on her front door. Ms. Briggs asked who was there and received no response.[21] Ms. Briggs testified that she heard sounds consistent with someone walking down the front steps of her porch, so she thought whoever was at her door had left. A moment later, Ms. Briggs heard sounds consistent with someone walking up the steps of her front porch and heard pounding at her front door again. Ms. Briggs asked again who was there, and the person responded, "it's Big Pun, I need some fucking weed."[22] Ms. Briggs told him it was one in the morning and to go away.[23] At that point Ms. Brigg's front door was kicked it, two men entered the premises with guns. Parker rolled off the bed, attempting to conceal himself from view.[24]

---

[18] *Id.* at 184
[19] *Id.*
[20] *Id.* at 188
[21] *Id.* at 192
[22] *Id.* at 193
[23] *Id.*
[24] *Id.*

Ms. Briggs testified that the men were wearing hospital masks, the Appellant was wearing a gray hoodie and basketball shorts, and the other male (Patrick Haynes) was wearing sweatpants and a black hoodie.[25] Ms. Briggs testified that when Diegdio spoke to her he pulled down his mask. [26]

Ms. Briggs testified that the men began asking her where Parker was while waiving their guns in her face.[27] At this point, Parker stood up from the side of the bed and asked the Appellant why he was doing this.[28] The Appellant asked Parker for money, when Parker gave the Appellant cash, he demanded more money.[29] Parker directed the Appellant to a bag containing single and five-dollar bills that he kept behind a television on top of his fireplace mantel.[30] The Appellant removed the television and placed it on the floor.[31] The Appellant opened the bag, asked Parker if that was it, at which point he turned around and shot Parker.[32]

Ms. Briggs testified that once she heard gunshots, she closed her eyes, backed up against the wall and lowered herself on the floor, anticipating that she would be shot next.[33] Ms. Briggs testified that Haynes asked the Appellant why he shot Parker, before receiving a response, Haynes shot Ms. Briggs.[34]

---

[25] *Id.* at 195
[26] *Id.*
[27] *Id.* at 194
[28] *Id.*
[29] *Id.* at 197
[30] *Id.*
[31] *Id.*
[32] *Id.*
[33] *Id.* at 197, 198
[34] *Id.* at 198

After being shot by Haynes, Ms. Briggs attempted to reach for her cell phone to call 911.[35] Once Ms. Briggs reached her phone, the screen illuminated, at which point the Appellant walked over to her and shot her in the chest.[36] Ms. Briggs testified that she played dead until both men fled out the back door.[37] Once Ms. Briggs felt safe, she called 911 and was airlifted to a hospital in Pittsburgh.[38] Ms. Briggs testified that she was shot a total of six times during the incident; and received gunshot wounds to her back, leg, chest, and hip.[39] Ms. Briggs stated that the bullet fragments in her body cannot be removed because they are in close proximity to vital organs and areas that would cause additional medical issues.[40]

While Ms. Briggs was receiving care at UPMC Presbyterian Emergency Room, a female detective came to see her and asked her to look at a photo lineup.[41] Ms. Briggs testified that she was not in the emotional state to cooperate with the lineup at this time and that she asked the detective to leave.[42]

The Commonwealth's next witness was Justin Laneve ("Laneve"), a state trooper for the Pennsylvania State Police.[43] Laneve testified that he was patrolling Beaver Falls on the night of September 25, 2020, with his partner, Trooper Dillon

---

[35] *Id.* at 199
[36] *Id.*
[37] *Id.* at 200
[38] *Id.* at 200, 202
[39] *Id.* at 219
[40] *Id.* at 203
[41] *Id.* at 205
[42] *Id.* at 206
[43] Transcript of Record: February 17, 2022, at 62, 63, *Commonwealth v. Diegdio,* (2022) (No. 1795 of 2020).

Burkarth.[44] Laneve provided testimony in conjunction with Commonwealth Exhibit 84a, which consisted of onboard camera footage from his patrol car.[45]

Laneve testified that the video depicted him and his partner pulling over a vehicle in Beaver Falls about a block away from the Premises.[46] Laneve testified that at a point in the video, time stamped 1:16 A.M., he observed a white Jeep Grand Cherokee go through the intersection at a rapid pace without coming to a complete stop at the stop sign.[47] Laneve testified that he found it odd that someone would fail to come to a complete stop and travel so quickly next to a patrol car that had its lights activated while police were conducting a traffic stop.[48] Immediately after observing the vehicle, Laneve scanned the Beaver County channel and became aware of shots fired nearby on 5th Avenue in the city of Beaver Falls.[49]

Laneve and his partner arrived on the scene after the traffic stop ended.[50] Laneve spoke with his partner and members of the Beaver Falls Police Department about the white Jeep Grand Cherokee he observed during the traffic stop.[51] Later that night, once the scene was cleared, Laneve and his partner attempted to locate the Jeep without success.[52]

---

[44] *Id.* at 65
[45] *Id.* at 68
[46] *Id.* at 69
[47] *Id.*
[48] *Id.*
[49] *Id.* at 70
[50] *Id.*
[51] *Id.* at 79
[52] *Id.*

The Commonwealth called Detective Justin Schlie ("Det. Schlie") of the Beaver Falls Police Department.[53] Det. Schlie was on duty the night of September 25, 2020, and had just been relieved of his shift when he received a call from Captain Martin, of the Beaver Falls Police Department, asking him to respond to a shooting scene.[54] Captain Martin stated that one victim was deceased and another shooting victim had been airlifted to a hospital in Pittsburgh.[55]

Capital Martin asked Det. Schlie if he knew someone by the street name "Pun."[56] Det. Schlie testified that at this point in time, he knew of a man named Josh Diegdio who went by the nickname of Pun.[57] Det. Schlie correctly identified the Appellant as Pun in the court room.[58]

Det. Schlie testified that once he was on the scene, he was asked to go to the police station in order to assist the investigation, at which point he began working on a photo lineup of Diegdio.[59] Det. Schlie testified that he began working on the lineup right away because a potential suspect was identified, and detectives believed that a victim was in critical condition in Pittsburgh.[60]

---

[53] *Id.* at 82
[54] *Id.* at 83
[55] *Id.* at 83, 84
[56] *Id.* at 84
[57] *Id.*
[58] *Id.*
[59] *Id.* at 85; *see also,* Commonwealth Exhibit 85
[60] *Id.*

Det. Schlie testified that the photo array was generated through a database called JNET.[61] Det. Schlie testified that JNET is authorized by the Commonwealth of Pennsylvania to access driver's license photos that can be used in a photo lineup; the photos are self-generated by either the subject that is searched for or a description of the subject.[62] Det. Schlie testified that the lineup was eight pages, one photo per page, because of the protocol he is required to follow.[63] Det. Schlie testified that they generally use eight photos of different individuals.[64] Once Det. Schlie completed the lineup, it was emailed to Detective Bonnie Sedlacek, who was in route to the hospital in Pittsburgh to see Ms. Briggs at this time.[65]

Detective Schlie testified about the instructions given when investigators conduct photo arrays with victims—detectives tell victims to take their time, to look at each photograph, and to make sure that they view every photo before they make their decision.[66] The photo array and identification are timed, when the victim identifies a suspect, investigators have them initial next to the photo they selected.[67] During the photographic array, the victim is presented with the photographs while the photographs are face down and the subjects are not visible. The victim is then told that whenever they are ready the investigator will begin to

---

[61] *Id.*
[62] *Id.* at 94
[63] *Id.* at 85
[64] *Id.*
[65] *Id.* at 87
[66] *Id.* at 98
[67] *Id.* at 99

flip the photographs over one at a time.[68] The victims are advised to look at every page during this process.[69]

Det. Schlie testified that on September 26th, while he was working the day shift, Ms. Briggs called the station wanting to speak to someone in reference to the incident.[70] Det. Schlie returned Ms. Briggs' phone call, at which point he was told she had received a Facebook request from the male that had shot her boyfriend. Det. Schlie testified that when he asked who that male was, Ms. Briggs stated the Facebook name was Joshua Diegdio.[71] Det. Schlie pulled up Diegdio's Facebook and asked if Ms. Briggs could describe the male she was looking at.[72] She stated that it was a large, light-skinned black male wearing a gray jumpsuit and that he was crossing his fingers.[73] Det. Schlie asked Ms. Briggs if she knew this male, and she stated she knew him as Pun, and that he was the male that shot her.[74] Det. Schlie asked how she knew him, and she stated that she knew him from Midland and that she had seen him hug Parker earlier in the day prior to the shooting.[75]

The Commonwealth called Detective Bonnie Sedlacek ("Det. Sedlacek") of the Beaver County District Attorney's Office to testify.[76] Det. Sedlacek responded

---

[68] *Id.* at 108
[69] *Id.*
[70] *Id.* at 89
[71] *Id.* at 90
[72] *Id.*
[73] *Id.*
[74] *Id.* at 91
[75] *Id.*
[76] *Id.* at 110

to UMPC Presbyterian on the night of the incident and reached the hospital at about 2:10am.[77] Upon her arrival, Ms. Briggs was in the trauma bay being treated.[78]

Det. Sedlacek was able to speak with Ms. Briggs once she was moved to a room in the emergency room.[79] Ms. Briggs described the incident to Det. Sedlacek, and stated that she knew one of the men who shot her went by "Pun."[80] Det. Sedlacek relayed that information to investigators on the initial scene.[81]

Det. Sedlacek testified that while she was in the emergency room with Ms. Briggs things were chaotic and there was a flurry of activity due to Ms. Briggs being treated for her injuries.[82] Det. Sedlacek testified that Ms. Briggs "was a wreck,"[83] and that she had been administered medication through an IV multiple times during the course of their conversation.[84] Det. Sedlacek testified that Ms. Briggs was very upset and distracted at different points during their conversation, and crying on and off, however she was focused at some points.[85] Det. Sedlacek said that Ms. Briggs was inquisitive about what was happening back at the scene,

---

[77] *Id.* at 112
[78] *Id.*
[79] *Id.* at 113
[80] *Id.* at 115
[81] *Id.*
[82] *Id.* at 114
[83] *Id.* at 137
[84] *Id.*
[85] *Id.* at 138

talking to the nurses about her injuries, and trying to find out information about Parker.[86]

Det. Sedlacek attempted to administered a photo lineup to Ms. Briggs while she was in the emergency room.[87] Det. Sedlacek testified that she was accompanied by a security guard who assisted in timing the photographic array, but that no other medical personnel were present in the room when the photo array was administered to Ms. Briggs.[88] Det. Sedlacek testified that she gave instructions to Ms. Briggs, including how to observe the photographs, and told her that the individual may or may not be depicted in the photos.[89] If Ms. Briggs was not 100% certain that the photograph depicted the suspect, she was advised that she shouldn't select anyone.[90] Det. Sedlecak began laying the photographs one at a time in front of Ms. Briggs.[91] Det. Sedlacek testified that she would take the first photograph away, and then put down the second photo, take the second one away and put down the third one, and continued to do so for all eight photographs.[92] Detective Sedlacek stated that in the event someone needs to see a photograph in the array again, she would start from the beginning of the sequence and not just hand over one photograph. Det. Sedlecak testified that this process took under five

---

[86] *Id.* at 139
[87] *Id.*
[88] *Id.* at 131
[89] *Id.* at 120
[90] *Id.*
[91] *Id.*
[92] *Id.*

minutes, Ms. Briggs did not depict anybody and refused to participate any further at that time.[93]

The Commonwealth called Detective Daniel Viscuso of the Beaver County District Attorney's Office.[94] Det. Viscuso testified that he pulled surveillance from several areas around the scene and observed a white Jeep Grand Cherokee in the area at the time of the incident.[95] Det. Viscuso stated that he was able to determine that the Jeep Grand Cherokee was rented from an Enterprise Car Rental, on Darlington Road in Chippewa, under Michael Waters name.[96] The car had been rented from mid-September to October 1st.

The Commonwealth's next witness was Timothy Higby ("Det. Higby"), Detective and Captain for the Beaver County Falls Police Department.[97] At the time of the incident, Det. Higby was a Detective and Sargent for the Beaver County Falls Police Department.[98] He had been assigned lead investigator for this incident. [99]

Det. Higby stated that as part of the investigation he collected surveillance from several areas around the premises.[100] Higby testified that he viewed surveillance from Franklin Tower, Early Head Start, Sweet Pea's Gas Station, and

---

[93] *Id.* at 121
[94] *Id.* at 143
[95] *Id.* at 153
[96] *Id.* at 154
[97] *Id.* at 157
[98] *Id.*
[99] *Id.* at 158
[100] *Id.* at 245

a Sheetz gas station located in the area.[101] Det. Higby testified that surveillance showed a white Jeep Grand Cherokee ("vehicle") travelling north and entering the 1400 block of Thomas Alley.[102] At one point, the footage shows the vehicle's lights switch off, the car eventually pulls off to the side of the alley and remains there. Higby testified that this was noteworthy, suspicious activity in his investigation, especially when being reviewed in light of a homicide.[103]

Surveillance was also pulled from 1622 6th Avenue.[104] Police observed that this location had an unsecured system and a camera facing out towards the front porch which possibly captured the roadway.[105] This footage was recovered, and it also showed a white Jeep Grand Cherokee in the area.[106]

The vehicle was spotted again on Sweet Pea's secured surveillance footage, traveling up Route 18 going North.[107] The vehicle was seen again on secured surveillance footage pulled from Sheetz travelling north on Route 18, time stamped 1:19:11 A.M.[108]

The Commonwealth called Michael Motton ("Motton") as a witness.[109] Motton lived in Beaver Falls at the Super 8 Motel and was a friend of Parker.[110]

---

[101] *Id.* at 225
[102] *Id.*
[103] *Id.*
[104] *Id.* at 234
[105] *Id.*
[106] *Id.* at 237
[107] *Id.* at 247
[108] *Id.* at 249
[109] Transcript of Record: February 22, 2022, at 16, *Commonwealth v. Diegdio,* (2022) (No. 1795 of 2020).
[110] *Id.* at 19

Motton testified that he often drove a White Jeep Grand Cherokee during September 2020 that was rented under Michael Waters' ("Waters") name.[111]

Motton testified that he was charged with conspiracy to commit robbery in connection with this case.[112] Motton also had charges filed against him regarding an unrelated incident, person not to possess a firearm, in August 2019.[113] Motton testified that he entered a guilty plea on this charge and received a twenty-year parole and five-year house arrest sentence.[114] He was given an incentive to testify at the Appellant's trial. In exchange for his truthful testimony, Motton would have the time for parole dropped from twenty years to ten years.[115]

Motton testified that on the night of September 24, the Appellant was socializing with Motton and other people in Waters' front yard.[116] Motton stated that "Latrell actually came running down the street and jumped in [Diegdio]'s arm like a baby."[117]

At one point in the night, Waters drove the Jeep Grand Cherokee to a Speedway gas station with Josh Diegdio, Patrick Haynes and Michael Motton.[118] Motton testified that they returned to Waters' house and, at around 1:00am, Diegdio and Haynes asked if Motton would "pick them up after they hit the

---

[111] *Id.* at 21
[112] *Id.* at 22
[113] *Id.* at 24
[114] *Id.* at 25
[115] *Id.*; *see also,* Commonwealth Exhibit 170: Plea agreement
[116] *Id.* at 29
[117] *Id.* at 53
[118] *Id.* at 29

lick."[119] Motton testified that hit a lick means to rob or to take somebody's possessions.[120]

Motton testified that he was advised to pick Diegdio and Haynes up in Thompson Alley, behind Waters' house.[121] Waters' house was located three houses away from the Premises where Parker was killed and Ms. Briggs was wounded.[122]

Motton then proceeded to drive down the alley, but didn't see anyone.[123] At that point, Motton testified that he returned to the front of Waters' house.[124] After a couple of minutes went by, Waters' instructed Motton to return to the alleyway and park in the church parking lot.[125] When he pulled back off in the alley, he could see Haynes and the Appellant go into the yard of the Premises and walk up to the porch. At this point, Motton lost sight of them.[126]

After a few minutes, Motton did not see anyone and proceeded to drive back to his hotel room, testifying that at this point he felt uncomfortable.[127] As he was pulling down the alley, he came across Haynes and the Appellant standing on both

---

[119] *Id.* at 32
[120] *Id.* at 33
[121] *Id.*
[122] *Id.* at 34
[123] *Id.* at 36
[124] *Id.*
[125] *Id.*
[126] *Id.*
[127] *Id.* at 38

sides of the street.[128]   Motton proceeded to stop the vehicle and allowed the Appellant and Haynes to get in. [129]

Motton testified that he didn't talk to Haynes or the Appellant until he saw a patrol car conducting a traffic stop about a block away, at this point he mentioned to the Appellant that he didn't have a license.[130]   Once they reached the Super 8, the Appellant asked if Motton would go to the front desk and get the Appellant's room key.[131]

Once he gave them the key, the parties separated.[132] At one point, the Appellant re-approached Motton and asked for a cigarette.[133]   Motton told him that he had to ask Motton's girlfriend, Brittany Lavette ("Lavette"), who was in Motton's hotel room.[134]   Appellant then told Motton that if Motton went back downtown, to ask Water's brother if he was still going to front the Appellant money to buy weed.[135] Motton testified that he found this statement to be weird, because Appellant should have had money to buy weed.[136]

Once the Appellant left, Motton received a call from Waters' telling him that he thought Latrell Parker and Alessandra Briggs had been shot.[137]   At that point,

[128] *Id.* at 39
[129] *Id.*
[130] *Id.*
[131] *Id.* at 40
[132] *Id.* at 41
[133] *Id.*
[134] *Id.*
[135] *Id.* at 42
[136] *Id.*
[137] *Id.* at 43

Motton drove the white Jeep Grand Cherokee back to 5th Ave.[138] Motton arrived at the scene and tried to get Waters' attention.[139] According to Motton, he was unable to speak to Waters until a couple of hours later. At this point, Waters and Motton agreed to go back to the Super 8 with a firearm to get street justice. Motton testified that this meant "do something back to them…anything that we can, shoot them, rob them, anything that we can."[140]

When Motton and Waters returned back to the Super 8, Motton's girlfriend, Lavette, told them that the Appellant had come back to the hotel room after Motton left, that she did not know what room he was in but she believed that the Appellant and Haynes had left in a cab.[141]

The Commonwealth also called Deputy Doug Hanna ("Deputy Hanna"), who was involved in the transport of the Appellant from Philadelphia to Beaver County.[142] Prior to Deputy Hanna's testimony, a sidebar before the Court took place, at which point an oral motion by the Commonwealth was made for the admittance of the Appellant's statement to Deputy Hanna during transport.[143]

When Deputy Hanna was transporting the Appellant, the Appellant spontaneously said, without questioning, that he did not understand why the deputies were treating him like El Chapo just because of a couple of bodies. The

---

[138] *Id.*
[139] *Id.*
[140] *Id.* at 46.
[141] *Id.* at 47
[142] Transcript of Record: February 28, 2022, at 28, *Commonwealth v. Diegdio,* (2022) (No. 1795 of 2020).
[143] *Id.*

Commonwealth argued that the statement made by the Appellant during transport was an admission by the Appellant because he had knowledge that there were two victims involved.

The Appellant's counsel objected to the statement being used as an admission, and also raised the issue of the statement being "prejudicial."[144] The defense argued that this was not a direct admission and allowing the statement in would allow the jury to infer too much from a "relatively vague statement" without context as to whether the Appellant knew or did not know of the fact that he was being arrested for murder.[145]

The Court overruled the defense's objection to the admittance of the admission. The court reasoned that, in light of the fact that the Criminal Complaint was filed on September 28th, and that the incident giving rise to the statement occurred a month later, the testimony of Deputy Hanna should be allowed. The Court stated that there was no question that the Appellant made the statement, and that it should be considered an opposing party's statement (declaration against his interest).[146]

Deputy Hanna testified that on October 27, 2020, he went to Philadelphia in order to pick up the Appellant and transport him back to Beaver County Jail.[147]

---

[144] *Id.* at 30
[145] *Id.* at 35
[146] *Id.* at 165
[147] *Id.* at 43

Deputy Hanna testified that he was unaware if the Appellant would have been informed of his charges prior to being transported.[148] Deputy Hanna testified that he didn't know the exact documents the facility received, but that he is usually sent to pick up an inmate with a packet of paperwork containing copies of documents which are faxed to the facility prior to the deputies going out to retrieve the inmate.[149] Deputy Hanna stated he was unaware of the protocols followed by the facility in Philadelphia, specifically he was unaware if they would have provided paperwork to the inmate or informed him of his charges prior to being picked up. [150]

Deputy Hanna testified that when he was picking up the Appellant, "he made a statement to me that we were treating him like [sic] El Chapo just because of a couple of bodies."[151]

Once testimony concluded, the Court met with both parties prior to reading instruction to the jury. The Court stated that at the very least this statement could be viewed as a statement against interest.[152] The Court stated that, although this statement was not made in response to police questioning, the evidence provided during testimony addressed an admission and jury instructions would have to provide for what is considered a spontaneous admission and a voluntary

---

[148] *Id.* at 45
[149] *Id.*
[150] *Id.*
[151] *Id.* at 43
[152] *Id.* at 164

admission.[153] The Court instructed the jury that they may not consider the statement as evidence against the Appellant unless they found beyond a reasonable doubt that the alleged crimes had been committed.[154]

## ISSUES

Appellant's Concise Statement of Matters Complained of on Appeal are as follows (recited verbatim):

I.  The Trial Court erred by not granting Appellant's motion for judgement of acquittal, at the conclusion of the Commonwealth's case, on the basis that The Commonwealth failed to prove that the Appellant was the actual person that committed the following charges: First Degree Murder, Criminal Attempt—Murder of the First Degree, Aggravated Assault, Robbery—Inflict Serious Bodily Injury, Burglary—Overnight Accommodations; Person Present Bodily Injury Crime and Conspiracy to Commit Robbery—Inflict Serious Bodily Injury (Weight of Evidence).

II. The Trial Court erred by not granting Appellant's motion for judgement of acquittal, at the conclusion of the Commonwealth's case, on the basis that there was insufficient evidence to support all of the charges; First Degree Murder, Criminal Attempt—Murder of the First Degree, Aggravated Assault, Robbery—Inflict Serious Bodily Injury, Burglary—Overnight Accommodations; Person Present Bodily Injury Crime and Conspiracy to Commit Robbery—Inflict Serious Bodily Injury

III. The Trial Court erred and/or abused its discretion in failing to grant the Appellant's motion for judgment of acquittal at the conclusion of the Commonwealth's case in chief, as there was insufficient evidence as to all counts, because the Commonwealth failed to establish that the Appellant committed the crimes.

IV. The Trial Court erred and/or abused its discretion when it denied the Appellant's omnibus pre-trial motion, including the motion to suppress the

---

[153] *Id.* at 153
[154] *Id.* at 43

photo array of the Appellant and the motion to suppress any evidence seized from the Appellant's ZTE cellular phone.

V.   The Trial Court erred and/or abused its discretion when it determined the Appellant's statement about being treated like El Chapo was an admission and permitted the testimony of Deputy Sheriff, Doug Hanna.

## ANALYSIS

## THE COMMONWEALTH ESTABLISHED BEYOND A REASONABLE DOUBT THAT APPELLANT COMMITTED THE CRIMES CHARGED AGAINST HIM
### WEIGHT OF THE EVIDENCE

Diegdio's first claim is that the verdicts are against the weight of the evidence. He contends that another individual, Brandon Cannon, put a "hit" out on the victim because that individual believed that the victim fired shots into that person's residence. This, Diegdio continues, established a motive for Mr. Cannon to murder the victim especially when the evidence showed that earlier on the day of the killing, Diegdio "embraced the victim." Even though the surviving victim identified Diegdio in court at trial and, even though that same surviving victim knew Diegdio and identified him at the scene and named him in the 911 call made minutes after the assault, Diegdio maintains that only the corrupt and polluted source witness, Michael Motten "put [Diegdio] at the scene."

"A challenge to the weight of the evidence is distinct from a challenge to the sufficiency of the evidence in that the former concedes that the Commonwealth has produced sufficient evidence of each element of the crime, but questions which

evidence is to be believed." **Commonwealth v. Charlton**, 902 A.2d 554, 561 (Pa. Super. 2006); **see also Commonwealth v. Edwards**, 229 A.3d 298, 306, appeal granted in part, 237 A.3d 978 (Pa. 2020), and aff'd, 256 A.3d 1130 (Pa. 2021) (same). "The weight of the evidence is exclusively for the finder of fact, who is free to believe all, none[,] or some of the evidence and to determine the credibility of the witnesses." **Commonwealth v. Talbert**, 129 A.3d 536, 545 (Pa. Super. 2015) (quotations omitted). "Resolving contradictory testimony and questions of credibility are matters for the finder of fact." **Commonwealth v. Delmonico**, 251 A.3d 829, 837 (Pa. Super. 2021). A court may not substitute its own judgment for that of the trier of fact. **See Id.** (citing **Talbert**, 129 A.3d at 545).

"In order for an Appellant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court." **Talbert**, 129 A.3d at 545 (internal quotation marks and citations omitted). When ruling on a weight claim, the trial court must determine whether "certain facts are so clearly of greater weight that to ignore them, or to give them equal weight with all the facts, is to deny justice." **Commonwealth v. Holt**, 273 A.3d 514, 532 (Pa. 2022), *cert. denied sub nom.* **Holt v. Pennsylvania**, 22-5463, 2022 WL 16542034 (U.S. Oct. 31, 2022) (citation omitted).

In **Commonwealth v. Smyser**, 195 A.3d 912 (Pa. Super. 2018), the Superior Court pointed out that identity is also an element of each crime that must be proven beyond a reasonable doubt:

"In addition to proving the statutory elements of the crimes charged beyond a reasonable doubt, the Commonwealth must also establish the identity of the Appellant as the perpetrator of the crimes." **Commonwealth v. Brooks**, 7 A.3d 852, 857 (Pa. Super. 2010), appeal denied, 610 Pa. 614, 21 A.3d 1189 (2011). "Evidence of **identification** need not be **positive** and certain to **sustain** a **conviction**." **Commonwealth v. Orr**, 38 A.3d 868, 874 (Pa. Super. 2011 (en banc) (citation omitted), appeal denied, 617 Pa. 637, 54 A.3d 348 (2012). As our Supreme Court has stated "any indefiniteness and uncertainty in the identification testimony goes to its weight. Direct evidence of identity is, of course, not necessary and an Appellant may be convicted solely on circumstantial evidence." **Commonwealth v. Hickman**, 453 Pa. 427, 430, 309 A.2d 564, 566 (1973) (citations omitted).

**Id.** at 915.

Further, to the extent that Diegdio challenges whether he was proven to be the perpetrator of the crimes due to questions surrounding the reliability of the witness' identification at trial, that claim goes to the weight of the evidence, not the sufficiency. "[A]ny uncertainty in an eyewitness's identification of an Appellant is a question of the weight of the evidence, not its sufficiency." **Commonwealth v. Cain**, 906 A.2d 1242, 1245 (Pa. Super. 2006) (deeming identification evidence sufficient, even where witnesses had previously identified the appellant in a photo array and at a preliminary hearing, but then expressed uncertainty in their identification at trial); see also **Commonwealth v. Kinney**, 157 A.3d 968, 971-72 (Pa. Super. 2017) ("Appellant argues that the victims provided 'unconvincing' and

'vague' identifications and 'inconsistencies regarding the Commonwealth's physical evidence.' Such claims are directed entirely to the credibility of the victim's testimony, and, as such, challenge the weight, not the sufficiency, of the evidence.") (citations omitted).

In this, case, the calamitous events of that evening began when Diegdio announced his name to his intended victims as he pounded on the portal to the victims' abode. The observations of the surviving victim confirmed that the intruder was the person who announced his presence outside the door and positive trial identification testimony of Diegdio was then provided by Ms. Briggs. This testimony wherein the surviving victim positively identified Diegdio as the shooter, during Diegdio's trial, alone, provides a sufficient basis to establish his identity as the perpetrator of the crimes for which he was convicted. **See Commonwealth v. Duncan**, 373 A.2d 1051, 1053-54 (Pa. 1977) (testimony of a single eyewitness sufficient to support conviction for third-degree murder); **Commonwealth v. Johnson**, 180 A.3d 474, 478 (Pa.Super. 2018) ("A victim's in-court testimony, identifying the Appellant as the perpetrator of a crime, is by itself sufficient to establish the identity element of that crime.").

Video surveillance evidence placed Diegdio at the scene when the attack occurred and Michael Motton then whisked Diegdio and his companion from the scene as was his task in the plot of Diegdio and another to "hit a lick" at the home

where one person was killed and another was critically wounded. This court, under these facts, cannot find that the evidence of guilt was so tenuous, vague and uncertain that the verdict shocks the conscience of the court. Therefore, the post-sentence weight of the evidence claim was properly denied.

## SUFFICIENCY OF THE EVIDENCE

Diegdio next asserts that the Commonwealth did not sufficiently establish that he was the shooter on the day in question. In essence, he challenges the sufficiency of the evidence showing that he was the perpetrator of crimes for which he was convicted.

The standard and scope of review of challenges to the sufficiency of the evidence is well-settled: [W]e evaluate the record in the light most favorable to the Commonwealth as verdict winner, giving it the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Any doubt about the Appellant's guilt is to be resolved by the fact-finder unless the evidence is so weak and inconclusive that, as matter of law, no probability of fact can be drawn from the combined circumstances. Additionally, the Commonwealth may sustain its burden solely by means of circumstantial evidence. **Commonwealth v. Lake,** ---

A.3d ---, 2022 PA Super 142, at *2 (Pa. Super. filed Aug. 15, 2022) (citations and quotations omitted).

In applying the above test, the entire record must be evaluated[,] and all evidence actually received considered. [T]he trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence. **Commonwealth v. Orr**, 38 A.3d 868, 872-73 (Pa. Super. 2011). Finally, the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. **Id.** at 872.

Although challenges to identity generally speak to the weight of the evidence, a narrow class of claims give rise to valid sufficiency challenge. **Commonwealth v. Orr**, 38 A.3d 868, 874 (Pa. Super. 2011) (en banc). To sustain a conviction, evidence of identification need not be positive and certain, and any indefiniteness or uncertainty in the identification testimony goes to its weight. **Commonwealth v. Minnis**, 458 A.2d 231, 234 (Pa. Super. 1983). "[A]lthough identification based solely on common items of clothing and general physical characteristics is insufficient to support a conviction, such evidence may be considered to establish identity along with other circumstances and the proffered identification testimony." **Id.** at 233 (citations omitted). In the presence of additional evidentiary circumstances, "any indefiniteness and uncertainty in the

identification testimony goes to its weight." **Commonwealth v. Orr**, 38 A.3d 868, 874 (Pa. Super. 2011) (citation omitted).

In **Minnis**, supra., the Court found that evidence was sufficient to establish the identity of the perpetrator of a robbery where a witness identified the Appellant by his jacket, the Commonwealth established that the Appellant was part of a group standing threateningly close to the victim, and the victim was familiar with Appellant as a member of that group. **Id.** 459 A.2d at 234.

Diegdio attacks the sufficiency of the evidence underpinning his convictions on identical grounds as those that were alleged in his weight of evidence claim. In particular, Diegdio alleges that the Commonwealth presented insufficient evidence to identify him, beyond a reasonable doubt, as the intruder who entered home of the home Latrell Parker and Alessandra Briggs.

In **Commonwealth v. Johnson**, 2018 PA Super 40, 180 A.3d 474, 478 (Pa. Super. Ct. 2018), the Appellant claimed that insufficient evidence existed to support "his identity as the perpetrator of the robbery committed against the victim." His argument was that "the victim's testimony could not establish, by itself, his identity as the perpetrator of the robbery." **Id.** The court held that, under those circumstances where a victim provided in-court testimony identifying the Appellant as the perpetrator, the argument of the Appellant in that case had "no support in existing case law."

The **Johnson** court found that "[A] victim's in-court testimony, identifying the Appellant as the perpetrator of a crime, is by itself sufficient to establish the identity element of that crime. (citation omitted). The court dismissed that attempts of the Appellant to "enhance his argument by asserting that the Commonwealth failed to present any corroborating evidence to support the victim's in-court identification testimony" as the court held that the lack of corroborating evidence "does not establish that the identity evidence was insufficient." **Id**. Even the "assertion that the victim's testimony was contradicted by his own" testimony was found to be "irrelevant" to a sufficiency analysis. **Id**. "Variances in testimony ... go to the credibility of the witnesses and not the sufficiency of the evidence." **Id**. (citation omitted). The sufficiency assertion in that case was thus found to be without merit. **Id**.

The sufficiency claims as developed by Diegdio are asserted with the backdrop consisting of evidence that Alessandra Briggs, the surviving victim, identified Diegdio as the assailant at trial. Even Diegdio as he first attempted to gain access to the Beaver Falls apartment told Ms. Briggs that it was "Big Pun" at the door that early morning and that he was seeking to enter the Parker and Briggs' apartment. "Big Pun" was the nom de querre for which Diegdio was known by in the community. Minutes after Diegdio shot Ms. Briggs on his way out of the

Premises, Ms. Briggs called 911 and identified Diegdio by his street moniker and a physical description.

Michael Motton, with testimony corroborated by sequential videos, described the planning of the robbery of the Parker-Briggs home and he plotted out the course of travel with Diegdio, from the time that Diegdio got into the car near the scene immediately after the shooting, until his arrival at the motel. Once Diegdio was at the motel, Brittaney LaVette recalled how Michael Motton and Diegdio arrived together into her room and then she described Diegdio's actions in removing a gun from his waist and putting it on a piece of furniture in the motel room. Under these circumstances, and in viewing the record in the light most favorable to the Commonwealth as verdict winner, giving it the benefit of all reasonable inferences to be drawn from the evidence, the sufficiency of evidence claim is without merit.

The issue set forth in the number three of the Concise Statement filed by Diegdio raises the same sufficiency of evidence claims addressed in the prior section of this Opinion and are deemed to be without merit for the same reason.

### THE TRIAL COURT DID NOT ERR OR ABUSE ITS DISCRETION WHEN DENYING THE APPELLANT'S OMNIBUS PRE-TRIAL MOTION

On August 25, 2021, the Appellant filed an Omnibus Pre-Trial Motion, consisting of a Motion to Suppress the Search Warrant for Appellant's Facebook Account, Motion to Suppress the Search Warrant for Appellant's Cellular

Telephone, a Motion to Suppress the Identification of Appellant stemming from the Photo Array, and Motion for Discovery. A hearing upon these matters was held on November 15, 2021. At the time of the hearing, the Commonwealth presented the testimony of Detective Justin Schlie, City of Beaver Falls Police Department, Detective Timothy Higby, City of Beaver Falls Police Department, and Detective Roger Patrick Young, Beaver County District Attorney's Office. The Commonwealth also entered the photo lineups, a video of the interview with the Brittany Lavette, and the search warrants into evidence. The Appellant has asserted that the suppression court erred and/or abused its discretion when it denied the motion to suppress the photo array and the cell phone search warrant.

## Identification and Photo Lineup

Detective Schlie of the Beaver Falls Police Department responded to the police department on September 25, 2020 to assist with a homicide investigation. Captain Higby asked him to finish preparing a photographic array he had started so that the Captain could conduct an interview. Detective Schlie advised that he was then assisted by Detective Robert Heberle with compiling the photo array.

Detective Schlie testified that the general process starts by entering the suspect's information and pulling up a reference photo. Then, the system provides a "search similar" option and auto populates photographs for use by the officers based on the physical characteristics of the suspect. When asked if the program

permits the user to further narrow the search by entering in search criteria based on the suspect's physical characteristics, the Detective indicated that it does have this option and that he believed he did enter such characteristics.

The array was sent to Detective Bonnie Sedlacek, who was at a hospital in Pittsburgh with the surviving victim in the case. However, Detective Sedlacek brought to Detective Schlie's attention that the background on the Appellant's photo was a different color than the other photos. Therefore, Detective Schlie obtained another photo of the Appellant with a background color that matched the other photos in the array.

This photo array was shown to Commonwealth witness, Brittany Lavette, on October 1, 2020 during an interview with Detective Higby and Detective Michael Kryder. This interview was recorded and introduced at the Suppression Hearing. Ms. Lavette indicated that an individual that she was unfamiliar with came to her hotel room the night of the homicide accompanied by a person she knew. She was provided the photo array and asked to identify if any of the people in the array were the individual. She ultimately picked out the photograph of the Appellant.

Appellant avers that the photo array was unduly suggestive and unreliable and therefore should be suppressed.

### Search Warrant – Cellular Phone

The Appellant was arrested in the City of Philadelphia and, at that time, the Appellant was in the possession of a ZTE cellular telephone. A search warrant was obtained, with the assistance of the authorities in Philadelphia, to seize the cellular telephone from the Appellant's property at the Curran Formhold Corrections Facility in Philadelphia. Then, Detective Young applied for a search warrant for a forensic extraction of the data contained in the Appellant's phone.

The Application for the Search warrant was signed by the Honorable Kim Tesla of the Court of Common Pleas of Beaver County.[155] The Affidavit of Probable Cause spanned nearly three (3) pages and began with a description of Detective Young's extensive experience as a detective.[156] The Affidavit of Probable Cause then goes through a timeline of events from the time of the homicide up until the apprehension of the Appellant in Philadelphia. Then, the affidavit of probable cause concludes with Detective Young's stated belief that information may be contained on the cell phone by reason of his training and experience that criminals commonly utilize cell phones to coordinate and communicate before, during, and after the commission of criminal activity.

The Application for Search Warrant requests all the information contained in the cellular telephone for the time period of September 18, 2020 through September 29, 2020.

---

[155] Commonwealth Exhibit 5, Application for Search Warrant, p. 1.
[156] Id. at p.2 ¶1.

The Appellant asserted that the search warrant for the cellular telephone was overbroad and had no nexus to the criminal charges at issue.

## DISCUSSION

### MOTION TO SUPPRESS THE PHOTO ARRAY AND SUBSEQUENT IDENTIFICATION BY BRITTANY LAVETTE

> Whether an out of court identification is to be suppressed as unreliable, and therefore violative of due process, is determined from the totality of the circumstances. Suggestiveness in the identification process is a factor to be considered in determining the admissibility of such evidence, but suggestiveness alone does not warrant exclusion. Identification evidence will not be suppressed unless the facts demonstrate that the identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. Photographs used in line-ups are not unduly suggestive if the suspect's picture does not stand out more than the others, and the people depicted all exhibit similar facial characteristics.

**Commonwealth v. Fulmore**, 25 A.3d 340, 346 (Pa.Super.2011) (quotation marks and citations omitted). Due process requires police to assemble an array of photographs of individuals who resemble the suspect, not the description provided by the victim or eyewitness. **Commonwealth of Pennsylvania v. Tyrell Bishop,** 2021 PA Super 222, f.n. 4 (Pa. Super. Ct. Nov. 15, 2021). Finally, the assertion of an incidental variation in appearance does not prove undue suggestiveness. **Commonwealth v. Kearney,** 92 A.3d 51, 66 (Pa. Super. Ct. 2014).

After hearing and review of the lineup photos, the trial court found that the background of each photo was similar, that each photo was of a headshot of the depicted individuals, that the facial features of all of the men were similar and that all of the men depicted in the photographs appeared to be of a similar age. The men were noted to have similar facial characteristics, facial hair, and hairlines. A mild variation in the complexion of the individual shown in photograph five (5) was noted and the suppression court found that the photograph of the Appellant showed a tattoo on his neck while the only other man in the lineup with an observable tattoo was the man in photograph two (2). The complete neckline of the men in photographs one (1), five (5) and seven (7) were found to be partially obstructed so that no neck tattoos were observable on those subjects and the remaining men in the photographs were found to have no neck tattoos. The suppression court held that these variations did not make Appellant's photograph stand out more than the others.

In **Commonwealth v. Fisher**, 769 A.2d 1116 (Pa. 2001), the appellant argued that the photo array was unduly suggestive because "both witnesses described the suspect as a light-skinned African–American male with freckles and a goatee, while only six of the eight pictures in the line-up showed men with goatees, and only one, the picture of the appellant, showed a man with freckles. **Id.** at 1126. Despite the fact that all of the men in the photographs did not

have goatees or freckles, the Supreme Court held that the photographs were substantially similar..." **Id.** at 1127. In **Fisher**, the Court noted the pictures were selected by a computerized system based upon similarity to the appellant and found the trial court did not abuse its discretion in reviewing and finding nothing unduly suggestive in the array. **Id.**

In **Commonwealth v. Kearney**, 92 A.3d 51, 66 (Pa.Super. 2014), the Court found that the claim that Appellant was the only person of light complexion included in the photo array was not supported by the evidence and the claim that the Appellant was the only person smiling in the array was insufficient proof of unreliability and suggestiveness. **Commonwealth v. Crork**, 966 A.2d 585 (Pa.Super. 2009) is a case where the Appellant claimed that the photo array was unduly suggestive where the array contained men of similar appearance but only one other man with light colored eyes was rejected as the Court found that the Appellant's photo did not stand out from the others.

In this case, in considering the totality of the circumstances, the court concluded that witness Brittany Lavette's out-of-court identification was not based upon a photo array so infected by suggestiveness as to give rise to a substantial likelihood of irreparable misidentification. The suppression court noted that the array was computer generated and that the backgrounds were the same. Finally, the suppression court found that all of the men in the photo array exhibited similar

facial characteristics. Accordingly, based on those findings made by the suppression court, the ruling which denied the request to suppress the lineup should not be disturbed as the factual findings of the suppression court are supported by the record and the legal conclusions drawn from those facts are correct.

**MOTION TO SUPPRESS SEARCH WARRANT FOR CELL PHONE**

In Section "C" of the Omnibus Pre-Trial Motion, the Appellant was seeking to suppress of the forensic download of his cell phone. Appellant contended that the search warrant was lacking a sufficient nexus to the alleged crimes, lacking in particularity and that the search warrant was overbroad.

The Constitutional claims surrounding the suppression issues raised by the Appellant are derived from the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution. Those Constitutional provisions provide protections "from unreasonable searches and seizures by police in areas where individuals have a reasonable expectation of privacy." **Commonwealth v. Barr**, 266 A.3d 25, 39 (Pa. 2021). "If a person has a reasonable expectation of privacy in a place, then these constitutional provisions generally require police to obtain a warrant to search the place; a search warrant must be supported by probable cause and issued by a neutral, detached magistrate." **Id.**

In **Commonwealth v. Johnson**, 240 A.3d 575, 585 (Pa. 2020), the Article I,

Section 8 of the Pennsylvania Constitution protections that "no warrant to search

any place or to seize any person or things shall issue without describing them as

nearly as may be, nor without probable cause, supported by oath or affirmation

subscribed to by the affiant" were explained as follows:

> Article I, Section 8 of the Pennsylvania Constitution ensures that
> citizens of this Commonwealth are protected from unreasonable
> searches and seizures by requiring that warrants: (1) describe the place
> to be searched and the items to be seized with specificity and (2) be
> supported by probable cause to believe that the items sought will
> provide evidence of a crime. See, e.g., **Commonwealth v. Waltson**,
> 555 Pa. 223, 724 A.2d 289, 292 (1998). Regarding the former
> requirement, we have interpreted the phrase "as nearly as may be" in
> Article I, Section 8 "as requiring more specificity in the description of
> items to be seized than the federal particularity requirement." Id. at
> 291, citing **Commonwealth v. Grossman**, 521 Pa. 290, 555 A.2d
> 896, 899 (1989) ("The clear meaning of the language is that a warrant
> must describe the items as specifically as is reasonably possible.").
> This more stringent requirement makes general searches impossible
> and "'prevents the seizure of one thing under a warrant describing
> another.'" **Grossman**, 555 A.2d at 899, quoting **Marron v. United
> States**, 275 U.S. 192, 196, 48 S.Ct. 74, 72 L.Ed. 231 (1927); see
> also **Commonwealth v. Matthews**, 446 Pa. 65, 285 A.2d 510, 514
> (1971) ("It cannot be disputed that general or exploratory searches
> through which officers merely hope to discover evidence of [a]ny kind
> of [a]ny wrongdoing are not constitutionally permissible.").

**Commonwealth v. Johnson**, 240 A.3d 575, 584 (Pa. 2020) (original citations

included).

The required analysis for alleged overbreadth and lack of particularity (ambiguity) attacks on a search warrant were described as follows in a recent Pennsylvania Supreme Court case:

> [B]oth doctrines diagnose symptoms of the same disease: a warrant whose description does not describe as nearly as may be those items for which there is probable cause. **For that reason, when assessing the validity of the description contained in a warrant, the natural starting point for a court is to determine for what items probable cause existed.** The sufficiency of the description [in the warrant] must then be measured against those items for which there was probable cause. Any unreasonable discrepancy between the items for which there was probable cause [to search] and the description in the warrant requires suppression. This is because an unreasonable discrepancy reveals that the description was not as specific as reasonably possible, meaning the warrant is overbroad, ambiguous, or perhaps both.

**Commonwealth v. Green**, 265 A.3d 541, 551 (Pa. 2021) (emphasis in original) (internal quotations and citation omitted).

Pursuant to the Pennsylvania dictates set forth in **Johnson** and **Green**, this Court must first determine for what items probable cause exists before the question of overbreadth can be assessed. Moreover, the Supreme Court has made clear a requirement that the parties include a probable cause analysis in any brief filed after December 22, 2021 raising an overbreadth issue. Specifically, that directive was stated as follows:

> It is worth emphasizing at this point, that in **Johnson**, a point of contention was the fact that no party affirmatively argued or briefed probable cause. Notwithstanding this Court's explicit pronouncement that probable cause "is one of [the] main tenets" of an overbreadth

analysis and that the two concepts could not be "meaningfully untangle[d]," **Johnson**, 240 A.3d 575, 586, Appellant forgoes a complete probable cause analysis in his brief. ...... **[G]oing forward, litigants should include analysis of any alleged insufficient showing of probable cause as it relates to their overbreadth challenge.**

**Commonwealth v. Green**, 265 A.3d 541, 551 (f.n. 5) (Pa. 2021) (emphasis added). The accepted definition of probable cause and the deferential standard by which a reviewing court must analyze the issuing authority's initial determination of probable cause were summarized in **Johnson**.

> Probable cause, as we have said many times over the years, is determined based on the totality of the circumstances. Thus, the task of the issuing [authority] is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.
>
> A reviewing court's duty, in turn, is merely to ensure the issuing authority had a substantial basis for concluding that probable cause existed. In so doing, the reviewing court must accord deference to the issuing authority's probable cause determination, and must view the information offered to establish probable cause in a common-sense, non-technical manner.

**Commonwealth v. Johnson**, 240 A.3d at 585 (internal quotations and citation omitted). Also, "[P]robable cause is based on a probability, not a *prima facie* case of criminal activity." **Commonwealth v. Green**, 265 A.3d 541, 551 (Pa. 2021).

In **Johnson**, police officers responded to a shots fired call at an apartment. They entered the home and secured the five individuals, including Johnson, who

were in the apartment. Heroin and two guns were found in plain view. In a search incident to the arrest of the Appellant, two cell phones were seized. More than "four months after the initial search and discovery of this sizable stash of drugs and firearms in the apartment, the officers sought and obtained a search warrant for appellant's two cell phones. **Commonwealth v. Johnson**, 240 A.3d at 580.

In **Johnson**, the Court reversed the denial of suppression, concluding that the law requires "some specific nexus between the items to be [searched and] seized and the suspected crime committed" and a "review of the affidavit of probable cause reveals no such link." **Id.** at 587-88 (quotation and citation omitted).

In part, the affidavit of probable cause in **Johnson** provided that:

> From previous drug investigations your affiants have been involved with, your Affiants have become aware that persons involved in the trafficking of controlled substances regularly use cellular telephones to accomplish their trafficking activities. These persons additionally maintain within their cellular telephones, information that includes the telephone numbers of persons to whom they distribute controlled substances to [sic], the telephone numbers of persons from whom they obtain controlled substances to distribute, abbreviations or acronyms for the persons to whom they distribute controlled substances to [sic], the persons from whom they obtain controlled substances to distribute, and pictures of controlled substances, firearms, and quantities of monies.

Under the facts of that case, the Supreme Court ascribed no value to the affiant's specialized knowledge that drug traffickers often use cell phones to conduct their business because the affidavit in that case was found to be "entirely

bereft of any facts tying the affiants' expert opinion to appellant specifically." **Id.** at 588. The Supreme Court acknowledged that an affiant's specialized knowledge and expertise may be relevant to establishing probable cause in some circumstances. **Id.** However, the Court indicated that in addition to the affiant's specialized knowledge and expertise, the affidavit of probable cause must contain "some link sufficient to connect the two." **Id.** The Court stated that "where law enforcement seeks to search a person's cell phone based on the person's mere proximity to illegal contraband, some link sufficient to connect the two must be provided in the affidavit of probable cause." **Id.** In that case where there was no evidence to establish anything more than that the Appellant was "merely present" at the residence when the cell phones were confiscated, the Supreme Court stated:

> Simply put, the affidavit of probable cause in this case provides little more than the bare fact that appellant was present in a place where illegal contraband happened to be found. That fact, in and of itself, cannot supply probable cause for a search of appellant's cell phone.

**Id.**

Problematic for the **Johnson** court was the fact that the affidavit lacked "evidence demonstrating" more extensive information regarding some evidence of a nexus to the crime under investigation and the item to be searched. **Id.** at 588. In the instant case, if the affidavit is reviewed with the deference that this Court must give to the issuing authority, the decision of the original issuing authority which found the necessary quantum of "evidence demonstrating" a sufficient nexus of the

facts in the affidavit and the opinions based on the experience of Detective Young with the items to be searched will not be disturbed.

Facts that the issuing authority could glean from the affidavit of probable cause distinguish this case from the situation that existed in **Johnson**, where the information in the affidavit of probable cause did nothing more than establish what the Supreme Court called a "bare fact." Detective Young's affidavit points out that the Appellant was identified as the shooter in a homicide, that the homicide and robbery in the house were committed by two people, including the Appellant, and, that a third likely participant included the getaway driver of the Jeep in which the assailants fled after the shooting. The affidavit also references a potential murder for hire scheme, where the person soliciting the murder utilized his phone and/or Snapchat for the potential solicitation of the murder that the Appellant is alleged to have committed. The affidavit pointed out locations where the getaway vehicle was seen and at what approximate times that vehicle would have been located in the exact areas identified on the video where the vehicle was observed. The affidavit also references a Facebook account of the Appellant, which presumably could be commonly utilized and accessed from a cell phone. The affiant also stated that based on Detective Youngs' "training and experience it was known that criminals commonly use cell phones to coordinate and communicate before, during

and after the commission of criminal activity." **Search Warrant Affidavit of Probable Cause**, p. 4.

As stated by the Supreme Court, "simply put," these facts, including the professional opinion and the experience of the affiant, Detective Young, that the offenders in this complicated potential murder for hire scheme were likely coordinating efforts via cell phone placed the issuing authority in a position to make a practical, common-sense decision that there was a fair probability that contraband or evidence of a crime will be found on the Appellant's cell phone. The suppression court, as a reviewing court, was required to accord deference to the issuing authority's probable cause determination and the suppression court viewed the information offered to establish probable cause in a common-sense, non-technical manner. It was held that such an analysis led to the conclusion that the search warrant for the cell phone was supported by probable cause.

The training and experience of an affiant can be a relevant factor for probable cause under the totality of the circumstances. **Commonwealth v. Nicholson**, 262 A.3d 1276 (Pa. Super. 2021). However, "there must be something in the affidavit that links the place to be searched directly to the criminal activity." Id. In **Nicholson**, the affidavit of probable cause contained an assertion of the affiant that drugs would be found in the home of the Appellant based on the

affiant's "professional experience" that drug dealers typically store drugs, weapons and other contraband in their homes." **Id.** at 1281.

The Superior Court affirmed the trial court's suppression of evidence by holding that merely referring to "professional experience" as to the places that drugs could be stored could be used to justify a search of any place where drugs could possibly be kept." **Id.** The lack of any facts to establish a nexus to the home of the Appellant was cited as a factor that led to the conclusion that the police officer's professional experience was not probative of the probable cause determination in **Nicholson. Id.** The affiant's general statement of the plethora of places that drugs could be stored was the only link in that case to support the request to search the home of the Appellant. There was no factual nexus that could connect the home to the criminal activity in that case. The instant case differs because of the facts cited above that could have been considered by the issuing authority to support a probable cause determination. Once again, given the deferential standard of the suppression court as a reviewing court, the decision of **Nicholson** does not control the outcome of the suppression motion filed by the Appellant.

The Pennsylvania Supreme Court approved a search warrant that authorized law enforcement to seize all digital devices connected to an IP address that it indicated would "later [be] searched for evidence relating to the possession and/or

distribution of child pornography[.]" The scope of the search in that case allowed the investigators to search "any and all devices" found in the Appellant's home, including computers and all cell phones, and, significantly, all of the content of those items without including a restriction to "include a specific date, type of file, or program in order to satisfy the requirement to describe the items as nearly as may be." **Commonwealth v. Green**, 265 A.3d 541, 555 (Pa. 2021). In **Green**, the Supreme Court approved a broad authorization to seize all devices and search through all data on the digital devices for evidence of possession and distribution of child pornography by concluding that such a search in that case complied with the Article I, Section 8 requirement that the warrant must describe the place to be searched and the things to be seized as nearly as may be. **Id.** at 555.

Because of the affiant's allegation in the affidavit of probable cause that the pornographic images could be hidden within an electronic device, the Supreme Court held that "just as with a search of a home and other spaces where an individual maintains a privacy interest, if there is probable cause that evidence of a crime will be found within an electronic device, that evidence should not be shielded simply because a Appellant comingles it with personal information in a digital space with vast storage capacity. This is particularly so when, like [in that case], the nature of the crime is electronic or internet based." **Id.**

**Commonwealth v. Dougalewicz**, 113 A.3d 817, 821, 828 (Pa. Super. 2015), is a case where the Superior Court found that a search warrant seeking "[a]ny and all text messages, picture mail, and phone calls to and from" the Appellant's phone was not overly broad because the affidavit of probable cause specifically limited the time frame for the phone records to be searched and "sufficiently identified and limited the items to be searched and seized ....". Similarly, in the instant case, limits on the extent of the information to be released pursuant to the search warrant are imposed by the date restrictions of the "[i]tems to be searched" part of the search warrant and by the factual limitations set forth in the search warrant affidavit of probable cause.

If the terms of the affidavit of probable cause are read as limiting the scope of the search, then, as in **Green**, the "warrant only allowed the officers to search for evidence of that particular crime. They could not indiscriminately rummage through any and all files as [Appellant] suggests, but rather could only conduct a digital forensic search ... for evidence relating to the crimes under investigation." **Commonwealth v. Green**, 265 A.3d 541, 555 (Pa. 2021). In **Green**, even though the warrant authorized the search of all of the information in multiple, unidentified devices, the Pennsylvania Supreme Court was "satisfied that the limiting language provided in the warrant and supported by the affidavit of probable cause was specific enough that rummaging would not be permitted, ...." and the Court was

further satisfied that the warrant would not "be used as a general investigatory tool." **Id**. Therefore, in that situation, the Supreme Court held that the "warrant sufficiently described the items for which there was probable cause, it was not overbroad." **Id**. That decision controls the outcome of the overbroad and lack of particularity claims as they relate to the cell phone search warrant in this case.

Therefore, the Motion to Suppress the Cell Phone data was denied and the request to seize the items requested on pages one (1) and six (6) of the search warrant for the cell phone were found not to be in violation of the particularity requirement of Article 1 Section 8 of the Pennsylvania Constitution or the 4th Amendment to the United States Constitution and the Appellant's claims are without merit.

## TESTIMONY BY SHERIFF DOUG HANNA REGARDING APPELLANT'S EL CHAPO STATEMENT WAS ADMISSIBLE

The Appellant argues that the Trial Court abused its discretion when it permitted testimony from Deputy Doug Hanna regarding a statement made by the Appellant during transportation to Beaver County Jail. The statement in question involves the Appellant stating to Hanna that he was being treated like El Chapo because he had two bodies.

The Supreme Court of Pennsylvania has stated "[t]he admissibility of evidence is to the discretion of the trial court and only a showing of an abuse of that discretion, and resulting prejudice, constitutes reversible error." **Sanchez**, 36

A.3d at 48. An abuse of discretion will only be found "when the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence or the record." **Commonwealth v. Flor**, 66 Pa. 384, 408, 998 A.2d 606, 620 (201).

In the court's reasoning when ruling on the admissibility of Deputy Hanna's testimony, the court referenced previous Pennsylvania case law, most notably **Commonwealth v. Elliot**, 140 A.537, 538-39 (Pa. 1928):

> "An 'admission' as applied to criminal cases has been defined as a 'statement by Appellant of a fact or facts pertinent to the issues, and tending, in connection with proof of other facts or circumstances, to prove the guilt, but which is, of itself, insufficient to authorize conviction; it is a circumstance which requires the aid of further testimony [to] generate a reasonable conclusion of guilt.' Voluntary statements made by an Appellant, although they may not amount to a confession of guilt, can be used against him if they tend to explain issues on trial."

In **Commonwealth v. Edwards**, 178 A.20, 22 (Pa. 1935), the Pennsylvania Supreme Court found no error in allowing "evidence of testimony by Warden Healey of the county jail and Dr. Freeman, the jail physician, concerning conversations had by them with appellant, after his arrest, in which Edwards admitted his guilt." It does not appear that the actual substance of Edwards' conversations are detailed. Nevertheless, the Supreme Court concluded that a

cautionary instruction to the jury, that they may attach whatever weight to an Appellant's admission can" amply protect Appellant's rights..."[157]

The trial court ruled that this statement made by Appellant during transport was admissible as a hearsay exception, a Statement Against Interest in accordance to Pa.R.E. 804(b)(3). The Pennsylvania Rules of Evidence provide that a statement against interest is a statement that:

> [A] reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability; and is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

The Pennsylvania Evidence Rule for a Statement Against Interest is identical to F.R.E. 804(b)(3). In **Williamson v. United States**, 512 U.S. 594, 599, 114 S. Ct. 2431, 2435 (1994), the United States Supreme Court noted that the Rule 804(b)(3) was "founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." A statement is sufficiently inculpatory to fall under this exception "if it would be probative at trial against the declarant." **United States v. Volpendesto**, 746 F.3d 273 (7th Cir. 2014). Further, the United States Supreme Court held in *California v. Greene*, that the admission of statements of a

---

[157] *Id.* at 23. See also *Commonwealth v. Bracey*, 662 A.2d 1062, 1068-1069, including footnote 9 (Pa. 1995).

witness as substantive evidence against a Appellant did not violate the Confrontation Clause of the Sixth Amendment.[158]

In the instant case, the Trial Court did not abuse its discretion by allowing testimony of the Deputy Hanna. The statement showed that the Appellant was under the impression that, by being transported back to Beaver County, he was being treated like a leader of an international crime cartel because "he had two bodies." The Jury was instructed to not consider the statement as evidence against the Appellant unless they found beyond a reasonable doubt that the alleged crimes had been committed.

Even if admittance of the statement was improper, the Appellant's conviction was not based exclusively on Deputy Hanna's testimony. There was overwhelming and sufficient evidence on the record for the jury to find the Appellant guilty beyond a reasonable doubt. The jury would have yielded the same result had the Deputy Hanna's testimony not been admitted. For example, the surviving victim, Alessandra Briggs, identified the Appellant as the man who entered her residence and shot her and Parker. Additionally, Michael Motton testified that he was with the Appellant at significant points on the night of the incident. Motton testified that had been instructed by the Appellant to stay in the area while he "hit a lick," Motton subsequently observed the Appellant enter the

---

[158] *California v. Green*, 399 U.S. 149 (1970).

yard of the Premises and had picked the Appellant up in close proximity to the crime in question.

In light of the limiting jury instruction provided with regard to the statement, and the overwhelming evidence presented at trial, the testimony of Deputy Hanna was permissible as a statement against interest.

## CONCLUSION

For the reasons stated above, this Court respectfully submits that the allegations of error in this case are without merit and therefore this Court's holding resulting from a deemed denial should be affirmed. The Beaver County Clerk of Courts is hereby directed to file the record of these proceedings with the Superior Court of Pennsylvania, an appropriate order shall follow.

Respectfully Submitted,

_____

# IN THE COURT OF COMMON PLEAS OF BEAVER COUNTY, PENNSYLVANIA
## CRIMINAL DIVISION

COMMONWEALTH OF
PENNSYLVANIA

vs.

JOSHUA LEE DIEGDIO

:
:
:
:
:
:

CP-04-CR-001795-2020

866 WDA 2022

## ORDER

**AND NOW,** this 7th day of November, 2022, it appearing that the defendant has filed a Notice of Appeal in the above-captioned case and it further appearing that the accompanying Memorandum Opinion satisfies the requirements of Pa. R.A.P. 1925(a), it is **ORDERED** that the Clerk of the Criminal Court Division of the Court of Common Pleas of Beaver County transmit the record in the above captioned case to the Superior Court forthwith.

BY THE COURT:

Mitchell P. Shahen, Judge